The COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF THE IOWA STATE BAR ASSOCIATION, Complainant,

v.

Larry J. O'CONNOR, Respondent.

No. 67724.

Supreme Court of Iowa.

Jan. 19, 1983.

Rehearing Denied Feb. 10, 1983.

Lee H. Gaudineer and Karen Shaff, Des Moines, for complainant.

Larry J. O'Connor, Waterloo, pro se.

CARTER, Justice.

This matter is before us for review of the decision of the Grievance Commission of the court recommending disciplinary action against respondent, Larry J. O'Connor. The Committee on Professional Ethics and Conduct filed a complaint charging respondent with several violations of the *Iowa Code of Professional Responsibility for Lawyers.* The matter was heard before the seventh division of the Grievance Commission which recommended suspension of respondent's license to practice law. Pursuant to Court Rule 118.10, we determine anew the appropriate discipline, if any, to be imposed. On our review of the record, we conclude that the serious violations which have been established warrant revocation of respondent's license to practice law.

Respondent is charged with unethical conduct in six separate counts involving four clients, Schoitz Memorial Hospital, Joan Osborn, James McCool, and If and When, Inc. The charges involving James McCool and If and When, Inc. both involve alleged conflicts of interest in respondent's representation of his clients. In the McCool matter, respondent purported to be representing James McCool's former wife in a proposed modification of the parties' dissolution of marriage decree while simultaneously representing James on a driving while intoxicated charge. In the If and When, Inc. matter, respondent formed a corporation with that name supposedly representing all of the shareholders and is accused of favoring the interests of certain shareholders over the interests of others in regard to certain corporate transactions. Because we find the evidence to be somewhat inconclusive in regard to the alleged breaches of professional responsibility, if any, by respondent in the McCool and If and When, Inc. matters, we give these transactions no weight in reaching our ultimate decision. The charges against respondent which do bear on our decision in this matter involve misappropriation of the funds of clients Schoitz Memorial Hospital and Joan Osborn. We separately consider these transactions.

I. *Schoitz Memorial Hospital.*

In June of 1978, Schoitz Memorial Hospital retained respondent to assist it in the collection of delinquent accounts. The par-

ty acting for the hospital in initiating this transaction was assistant hospital administrator Claire Canfield. It appears without dispute that the fee arrangement agreed to by Mr. Canfield and respondent at this time was a percentage fee fixed at twenty-five percent of the amount collected.

Between June of 1978 and May of 1980, the total sum of $3258.79 was paid to respondent by obligors of these delinquent accounts and, in addition, the sum of $2915.76 was paid directly to the hospital by said obligors. It is not disputed that the base upon which respondent's percentage fee was to be computed is the sum of these figures or $6174.55. Prior to the time of the filing of the complaint against respondent in this disciplinary proceeding, the only remittance made by respondent to the hospital for its share of the account payments which had come into his hands was the sum of $556.13 remitted to the hospital on November 10, 1978, with an explanation that it represented seventy-five percent of collections which had been received up to that time.

In mid-November of 1978, Mr. Canfield left his employment with the hospital. His successor arranged to have the Waterloo Credit Bureau handle its collections, and on September 27, 1979, wrote to respondent advising him that he would no longer be handling the hospital collection business. This letter requested that hospital accounts turned over to respondent for collection now be delivered by him to the credit bureau, together with the pertinent files. The hospital offered in this letter to reimburse respondent for any expenses he had incurred in the handling of the accounts which were to be transferred to the credit bureau. Subsequently, Mr. Raymond Burfiend, associate administrator of the hospital, requested an accounting from respondent with respect to hospital funds, if any, in his possession as a result of his collection efforts.

When the requested accounting was not forthcoming, the files were not transferred to the credit bureau, and respondent neglected to return Mr. Burfiend's telephone calls, the hospital retained another Waterloo attorney to attempt to obtain respondent's cooperation. Beginning in April of 1980, that attorney attempted to obtain from respondent the desired accounting and transfer of the files with no success. After several oral and written demands were ignored, he contacted the Client Security and Attorney Disciplinary Commission about the matter. That contact resulted in a preliminary audit of respondent's trust account by that commission on May 7, 1980.

When questioned by the commission auditor, respondent stated that he had kept the hospital informed of the status of its accounts by periodic telephone calls to a hospital employee named Elinor Kock. Respondent told the auditor that during these conversations, he was advised by Ms. Kock that several obligors of the accounts respondent was collecting had made payments directly to the hospital; that when these payments were reconciled with the sums paid to respondent, it resulted in the hospital owing him money. When pressed for an accounting of the payments upon which this assertion was based, respondent sought to support such claims by means of a fee entitlement of fifty percent of amounts collected. When pressed by the auditor for documentation of a fifty percent fee agreement with the hospital, respondent said that he had a letter to that effect but could not locate it. In contrast to respondent's claims to the auditor, Elinor Kock denied that respondent had ever discussed the status of these accounts with her, and the hospital produced a letter confirming a twenty-five percent fee arrangement with respondent.

Following the May 7, 1980, preliminary audit by the Client Security and Attorney Disciplinary Commission, that commission and the hospital, each working independently of the other, determined that respondent, after being credited for fees of twenty-five percent of amounts collected owed the hospital either $1159.12 or $1061.49, depending on how certain out-of-pocket advances by respondent were credited. The commission audit of respondent's trust account re-

flected that he had retained none of the funds collected for the hospital other than the $556.13 which was transmitted to the hospital on November 10, 1978, and for which credit was given in arriving at the final amount owed. On May 21, 1981, five weeks after the present complaint was filed against the respondent, he remitted the sum of $1061.49 to Schoitz Memorial Hospital.

At the hearing before the Grievance Commission, the respondent testified that the percentage fee arrangement with the hospital had been modified from twenty-five percent to fifty percent by an oral agreement between himself and Mr. Canfield in November of 1978. When pressed for the precise time of such agreement, respondent stated that it occurred between the time of his November 10, 1978, accounting to the hospital reflecting a twenty-five percent fee entitlement and Mr. Canfield's departure from the hospital staff in mid-November of 1978. Mr. Canfield testified at the hearing and denied that the twenty-five percent fee arrangement was modified. In addition, some internal records kept in respondent's law office subsequent to Mr. Canfield's departure from the hospital staff continued to reflect a twenty-five percent fee arrangement on Schoitz Memorial Hospital accounts.

## II. *Joan Osborn.*

Those counts in the complaint involving Joan Osborn flow from the following transactions as shown by the record. Joan Osborn moved to Iowa from the state of Washington in September, 1979, and employed respondent to represent her in a post-dissolution decree dispute with her former husband. This dispute involved in part sums of money in Osborn's possession, which her husband claimed were owed to him under the decree. At the inception of the attorney-client relationship, Joan Osborn paid respondent a $1000 retainer and agreed to an hourly rate of $50 for legal services performed in this representation. During the time that respondent was representing this client, she gave respondent ad-

ditional funds to place in his trust account. She gave him $6110.25 for this purpose on January 9, 1980, and $2000 on January 12, 1980.

Joan Osborn terminated respondent's representation on May 9, 1980, and asked him to return to her the funds he was holding in his trust account. At this time, respondent informed her that his bill to date for attorney fees and expenses totaled $5931.94 and that said charges had been applied in reduction of the $9110.25 which had been paid to him leaving only $3178.31 to be returned to her. Respondent had not given Joan Osborn an accounting of fees and expenses prior to this time.

During the May 9, 1980, meeting between Joan Osborn and respondent, she disputed his entitlement to the $5931.94 in fees and expenses but acquiesced in taking a check for $3178.31 from respondent's trust account until the matter was resolved. On May 9, 1980, the date this check was written, respondent did not have sufficient funds in his trust account to cover the check. Joan Osborn learned of this when she presented the check for payment at the drawee bank. On May 12, 1980, respondent made a deposit in his trust account sufficient to bring the balance thereof above the amount of the Osborn check. When she presented the check for payment a second time, respondent stopped payment on the check when the bank informed him that Joan Osborn had noted thereon that the check did *not* constitute full payment of sums owed. It was not until April 15, 1981, one day after the present complaint was filed by the Committee on Professional Ethics and Conduct that respondent made payment to Joan Osborn in the sum of $3178.31.

An audit of respondent's trust account conducted by the Client Security and Disciplinary Commission revealed that based upon respondent's own billing records, a substantial portion of the $5931.94 had been transferred from the trust account as "fees earned" prior to the time the services are shown to have been performed. In addition, the audit reveals that on May 1, 1980,

the total balance on deposit in respondent's trust account from all sources was only $238.95, at which time respondent concedes he still owed Joan Osborn at least $3178.31.

At the hearing before the Grievance Commission, Joan Osborn testified that only the initial $1000 paid to respondent was to be applied toward the costs of litigation. She testified that the remaining $8110.25 was placed in respondent's trust account with his knowledge and approval in order to make the facts fit the testimony which she had given in a deposition. She stated that she had testified in the deposition that $8000 in her possession, which her former husband was trying to locate, had been placed in respondent's trust account. She testified that in fact the funds were given to respondent after such testimony had been given. Respondent denied Joan Osborn's version of the transaction in his testimony before the Grievance Commission and stated that the entire $9110.25 was paid to him for purposes of being applied on his attorney fees and out-of-pocket advances.

III. *Summary and Disposition.*

Without question, the record establishes that respondent breached his professional responsibility as a lawyer by failing to account for clients' funds in his possession, failure to maintain clients' money separate from his own and failure to return clients' funds within a reasonable period of time after being requested to do so. This conduct constitutes serious violations of the *Iowa Code of Professional Responsibility for Lawyers,* Ethical Consideration 1–5; Disciplinary Rule 1–102(A)(1), (3), (4) and (6); Ethical Consideration 9–5; and Disciplinary Rule 9–102, calling for substantial discipline.

The more serious issue which we must resolve is the claim that respondent converted clients' funds to his own use. Our disciplinary decisions have quite consistently held that such conduct calls for revocation of license rather than suspension. *Committee on Professional Ethics and Conduct v. Pappas,* 313 N.W.2d 532 (Iowa 1981); *Committee on Professional Ethics and Con-*

*duct v. Shaffer,* 230 N.W.2d 1 (Iowa 1975); *Committee on Professional Ethics and Conduct v. Rowe,* 225 N.W.2d 103 (Iowa 1975); *Committee on Professional Ethics and Conduct v. Bronemann,* 210 N.W.2d 607 (Iowa 1973); *Committee on Professional Ethics and Conduct v. Sturek,* 209 N.W.2d 899 (Iowa 1973).

Our review of the present record is de novo. *Committee on Professional Ethics and Conduct v. Rabe,* 284 N.W.2d 234, 235 (Iowa 1979); *Committee on Professional Ethics and Conduct v. Bitter,* 279 N.W.2d 521, 522 (Iowa 1979). Allegations of misconduct must be established by a convincing preponderance of the evidence. *Rabe,* 284 N.W.2d at 235. Viewing the record before us in this light, we find that it clearly requires a finding that respondent did convert the funds of both Schoitz Memorial Hospital and Joan Osborn to his own use. Respondent's efforts to pass the Schoitz Memorial Hospital incident off as a mere fee dispute is unpersuasive. When pressed by the hospital for an accounting, he made no response. This conduct is inconsistent with his later claim that the hospital owed him money as a result of a change in the fee arrangement. Respondent's claim concerning the change in the fee arrangement did not surface until he was being audited by the Client Security and Disciplinary Commission, a circumstance which he must have realized would establish a shortage of client's funds under the existing percentage fee arrangement with the hospital. We find that respondent's claim that the fee arrangement had been modified was an attempt to conceal the conversion of client funds which had taken place.

In the Joan Osborn transaction, it appeared without dispute that on May 1, 1980, respondent's trust account balance was virtually depleted; yet, even when the evidence is viewed most favorably to him, he was holding at least $3178.31 of client funds. We note in this regard that the record will support a finding that an even larger amount of client funds were entrusted to his possession at this time. Respondent's only explanation for the condition of

his trust account on May 1, 1980, was to claim that the missing client money was not converted to his personal use but was applied on cost advances made on behalf of other clients. Respondent offered no documentation of this claim. In any event, application of clients' funds to the use and benefit of third parties is only slightly distinguishable, if at all, from a conversion to the lawyer's own use and benefit. Based upon the established charges of conversion of clients' property and the other violations of professional conduct which we have found to exist, we direct that the license of Larry J. O'Connor to practice law in this state be revoked.

LICENSE REVOKED.