**COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,**

v.

**James W. CODDINGTON, Respondent.**

No. 84-1335.

Supreme Court of Iowa.

Jan. 16, 1985.

Frank A. Comito, Jr., Mark A. Critelli, and Hedo M. Zacherle, Des Moines, for complainant.

Fred G. White, Waterloo, for respondent.

LARSON, Justice.

The Committee on Professional Ethics and Conduct of the Iowa State Bar Association filed a complaint with the grievance commission of this court charging the respondent, James W. Coddington, with several violations of the Iowa Code of Professional Responsibility for Lawyers in connection with his collection of fees in three probate matters. A division of the grievance commission concluded that, while Coddington had violated several of these rules, his acts were negligent, not willful, and therefore recommended only a reprimand. The ethics committee was granted leave to appeal to this court. Court Rule 118.11. On our de novo review of the proceedings, we agree that the respondent violated several of the ethical and disciplinary rules. Unlike the commission, however, we find the violations were willful, and, therefore, suspend his license to practice law.

The violations charged arose in connection with the conservatorship and estate of Fred Hamke and the estate of Majoyre Crooks Litterer. Fred Hamke had been a longtime client of the respondent. In 1979,

Mr. Hamke's health deteriorated to the point that he was hospitalized. Pursuant to Hamke's voluntary petition, Coddington was appointed as conservator of his property and began to act as attorney as well as conservator. In April 1983, Mr. Hamke died, and the respondent served as executor and attorney for his estate.

Following Mr. Hamke's death, a niece, Erna Wiley, came to the respondent's office with questions regarding his fees in the conservatorship. Coddington directed her to the clerk's office where, he told her, the information was a matter of public record. Following her examination of the records in the clerk's office, Mrs. Wiley filed a complaint with the ethics committee, contending that excessive fees had been taken from the conservatorship.

During Coddington's administration of the conservatorship, he paid himself a total of $33,600 from the conservatorship funds. Of that amount, payments totaling $18,600 were due him as fiduciary and attorney, according to him, and were in effect ratified by court orders entered after their receipt by Coddington. The remaining $15,000, however, was not authorized by court order either before or after their receipt, and Coddington does not claim that this additional amount was owed to him as fees. He claims only that the $15,000 was received in error, a result of "extreme carelessness" in his handling of the matter. The $15,000, with accrued interest, has been repaid.

Coddington filed three annual reports and a final report in the Hamke conservatorship. The first report covered the period from July 31, 1979 to July 30, 1980. The second report covered from July 31, 1980 to July 30, 1981, and the third from July 31, 1981 to July 30, 1982. The final report, filed after Hamke's death, covered the period of July 31, 1982 to April 2, 1983. The record shows that a guardian ad litem was appointed to represent Mr. Hamke in connection with the annual reports and that all the reports were approved by court order.

These reports to the court consisted of a narrative report and a schedule of receipts and disbursements for the periods covered. In the narrative portions of his annual reports, Coddington pointed out that he had received advance fees. His final report did not mention advance fees. In the disbursements schedule attached to each of his reports, including his final report, the payment of advance fees was listed. The respondent points to this fact in arguing that he was not guilty of deceit in collecting the excess "fees."

Coddington explained that his probate procedures have placed a great reliance on his office personnel. His secretary usually prepared the accountings from which the probate reports were made, based upon bank statements, cancelled checks, and deposit slips. Coddington then prepared the actual reports and the proposed orders approving them. All disbursements in the Hamke conservatorship were made by check prepared by the respondent and drawn on the conservatorship account. There was, however, no internal control by which any office personnel checked to see that the amount of fees actually paid corresponded with those ordered by the court, according to Coddington. Thus, duplicate payments became possible.

The attached chart shows the dates and amounts of all payments received from the conservatorship and the dates and amounts of the court orders on fees, as well as the cumulative totals of the fees authorized by court order and the cumulative totals of the overpayments received by Coddington. As the chart reveals, all of the fee orders were obtained after the payments had actually been received by Coddington. (Advance fee payments were also received in the Hamke estate and the Litterer estate but, in contrast to the Hamke conservatorship, there is no claim in either of those probate matters that fees had been obtained without any court approval.)

All of the payments received by Coddington in the Hamke conservatorship were improper, despite the fact some of them were, in effect, later ratified by court

orders. This is so because fees in probate matters are to be received only after their authorization by the court. *See* Iowa Code §§ 633.197, .198 (fiduciary and attorneys fees in estates to "be determined by the court for services rendered"); and § 633.20 ("court shall allow and fix the compensation for [other] fiduciaries."). *See also* Iowa R.Prob.Pro. 2 (one-half estate fees may be sought on preparation of death tax returns and balance upon final report).

Coddington does not argue this point; he concedes it was improper to obtain the $18,600 in fee payments without prior court approval, and the commission, while it points out the impropriety of these advance payments, does not emphasize them in its approach to this case.

What both parties focus on is the effect of Coddington's withdrawal of the $15,000 in additional conservatorship funds which was not authorized by any court order either before or after the fact. Was it, as Coddington claims, merely the result of "extreme carelessness" or was it a willful act of conversion of conservatorship funds as the commission suggests?

Iowa Code section 610.23 recognizes the power of this court to revoke or suspend the license of the lawyer and the following section enumerates the grounds. One of these grounds is a "willful violation of any of the duties of an attorney or counselor as hereinbefore prescribed." Iowa Code § 610.24.

The committee charges a violation of DR 1–102(A), which provides:

A lawyer shall not:

(1) Violate a disciplinary rule.

. . . .

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

It also charged a violation of DR 2–106(A) ("A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.")

In addition, it alleges violations of EC 1–5, requiring a lawyer to maintain high standards of professional conduct and to refrain from all illegal and morally reprehensible conduct; EC 2–8, providing that it is the duty of a lawyer to avoid consideration of personal advantage or profit and reminding the lawyer that the public expects a lawyer to be a person of ability and integrity; EC 9–1, requiring a lawyer to promote public confidence in the legal system; and EC 9–6, providing that every lawyer owes a solemn duty to uphold the integrity and honor of the profession, to encourage respect for the law, and to observe the Code of Professional Responsibility.

As noted, the narrative portions of Coddington's first three conservatorship reports acknowledged that he had received advance fees. (The narrative portion of the final report does not mention advance fees, but advance fees are set out in the disbursement schedule attached to it.) After he received court approval for fees, however, he proceeded to pay himself the full amount allowed, and more, without regard to what had been advanced. This was not merely an isolated incident. It may be seen by the attached chart that the withdrawals of "fees" were frequent and seemed to have little relationship to any amount actually owed at the time or to the court orders entered in regard to fees. Also, except for the time on August 18, 1980, when the court order in effect ratified all the fees received to date, Coddington was always overdrawn on any fees owing.

▮ The cumulative overpayment to him was almost continually increasing. If, as the respondent claims, the excess draw was merely the result of negligence or careless accounting, it would appear that at least occasionally error would have fallen in favor of the conservatorship. That did not happen. We conclude, based upon a review

of the entire record, that these acts were willful, not negligent, and violated DR 1–102(A)(1), (3), (4), (5), and (6); DR 2–106(A); EC 1–5; EC 2–8; EC 9–1; and EC 9–6. This conclusion, we believe, is established by a convincing preponderance of the evidence which is the standard to be applied. *Committee on Professional Ethics and Conduct v. Kraschel*, 260 Iowa 187, 194, 148 N.W.2d 621, 625 (1967).

The matter of discipline remains. The committee brief argues that the respondent's actions amount to a commingling of funds, and cites cases holding that disbarment is the required sanction for such acts. (The committee's complaint, however, did not charge a violation of DR 9–102 [preserving identity of funds] or of EC 9–5 [separation of funds]. It asks this court to consider them nevertheless under a kind of "notice pleading" theory. We decline to do so.) In oral argument, the committee suggested that something less than revocation would be appropriate under the circumstances of this case. The respondent argues that, if any sanction is to be applied, a reprimand is sufficient.

We believe the infractions demand more than a reprimand. Nevertheless, a suspension of the respondent's license, not revocation, seems to be the appropriate sanction to be applied. While Coddington obtained the $15,000 from the conservatorship without court approval, and we believe willfully, it must be distinguished from the typical commingling case. Because Coddington had disclosed the amounts he had received, he did not, as in most commingling cases, compound his misdeeds by covering them up. As Mrs. Wiley has demonstrated, his receipt of these "fees" could be, and were, easily discovered by examining the probate file and comparing the disbursement schedules with the court orders. While this does not, of course, demonstrate a lack of willfulness on the part of the respondent, we do consider it as a mitigating circumstance.

■ We hold respondent's license to practice law should be suspended indefinitely with no possibility of reinstatement for two years. This suspension shall apply to all facets of the practice of law. *See* Court Rule 118.12. Upon application for reinstatement, respondent shall have the burden to prove that he has not practiced law during the period of suspension and that he meets the requirements of Court Rule 118.13.

LICENSE SUSPENDED.

All Justices concur except HARRIS and CARTER, JJ., who take no part.

COMMITTEE v. CODDINGTON

| DATE | AMOUNT RECEIVED | CUMULATIVE AMOUNT RECEIVED | AMOUNT ORDERED | CUMULATIVE AMOUNT ORDERED | CUMULATIVE OVERPAYMENT |
|---|---|---|---|---|---|
| 12/04/79 | 300.00 | 300.00 | 0 | 0 | 300.00 |
| 08/18/80 | 3,300.00 | 3,600.00 | 0 | 0 | 3,600.00 |
| 08/19/80 | | 3,600.00 | 3,600.00 | 3,600.00 | 0 |
| 09/23/80 | 1,500.00 | 5,100.00 | 0 | 3,600.00 | 1,500.00 |
| 01/23/81 | 1,000.00 | 6,100.00 | 0 | 3,600.00 | 2,500.00 |
| 04/22/81 | 1,000.00 | 7,100.00 | 0 | 3,600.00 | 3,500.00 |
| 08/14/81 | 1,000.00 | 8,100.00 | 0 | 3,600.00 | 4,500.00 |
| 08/15/81 | 2,000.00 | 10,100.00 | 0 | 3,600.00 | 6,500.00 |
| 08/18/81 | | 10,100.00 | 5,500.00 | 9,100.00 | 1,000.00 |
| 09/15/81 | 1,500.00 | 11,600.00 | 0 | 9,100.00 | 2,500.00 |
| 10/08/81 | 1,000.00 | 12,600.00 | 0 | 9,100.00 | 3,500.00 |
| 01/04/82 | 1,000.00 | 13,600.00 | 0 | 9,100.00 | 4,500.00 |
| 02/11/82 | 2,000.00 | 15,600.00 | 0 | 9,100.00 | 6,500.00 |
| 04/02/82 | 2,000.00 | 17,600.00 | 0 | 9,100.00 | 8,500.00 |
| 04/30/82 | 2,000.00 | 19,600.00 | 0 | 9,100.00 | 10,500.00 |
| 09/24/82 | 2,000.00 | 21,600.00 | 0 | 9,100.00 | 12,500.00 |
| 11/08/82 | | 21,600.00 | 5,000.00 | 14,100.00 | 7,500.00 |
| 11/09/82 | 3,000.00 | 24,600.00 | 0 | 14,100.00 | 10,500.00 |

| DATE | AMOUNT RECEIVED | CUMULATIVE AMOUNT RECEIVED | AMOUNT ORDERED | CUMULATIVE AMOUNT ORDERED | CUMULATIVE OVERPAYMENT |
|---|---|---|---|---|---|
| 01/08/88 | 2,500.00 | 27,100.00 | 0 | 14,100.00 | 18,000.00 |
| 02/23/88 | 2,000.00 | 29,100.00 | 0 | 14,100.00 | 15,000.00 |
| 04/15/88 | | 29,100.00 | 4,500.00 | 18,600.00 | 10,500.00 |
| 04/15/88 | 4,500.00 | 33,600.00 | 0 | 18,600.00 | 15,000.00 |