**COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,**

v.

**Jay C. OEHLER, Respondent.**

**No. 84–396.**

Supreme Court of Iowa.

June 13, 1984.

Rehearing Denied July 11, 1984.

Lee H. Gaudineer, Jr., and Hedo M. Zacherle, Des Moines, for complainant.

Jonathan C. Wilson of Davis, Hockenberg, Wine, Brown & Koehn, Des Moines, for respondent.

HARRIS, Justice.

In this attorney disciplinary proceeding the respondent and the committee reached a stipulation on many of the facts and recommended a two-year suspension. Upon our *de novo* review of the entire record, including the stipulated facts, we find the respondent's license should be revoked.

The facts are inordinately complex and not easily subject to narrative description. Superficially, it might seem that the complexity is suggested as a defense, as if the respondent could somehow find refuge from the complaint in the difficulty of searching out the facts. If so, there is no such refuge for respondent here. In the first place, in view of the fiduciary relationships involved, it was incumbent upon him to show he faithfully discharged his stewardship. *See Clinton Land Co. v. M/S Associates, Inc.*, 340 N.W.2d 232, 234–35

(Iowa 1983). In the second place, we think we have untangled the facts.

It is apparent that respondent engaged in a repeated practice, amounting almost to a habit, of using entrusted fiduciary funds for his direct or indirect personal advantage. There are a number of instances of representing both sides of what should have been arms-length transactions. On occasions one of the sides was his own personal one.

I. Respondent is an Iowa City lawyer, admitted to practice in 1951. The charges against him are derived from his mishandling of funds in a charitable trust. Those funds, in turn, were derived from the estate of Mayme Wagner, who died in Florida in 1963. She devised substantial real property in and near Iowa City to Gertrude M. Murphy. Gertrude Murphy had been a long-time secretary for respondent's law firm. Because of her advanced age and infirm health at the time, she was unable to testify in these proceedings.

It is readily apparent that Gertrude Murphy was unselfish and high minded. The stipulation explains:

Although Ms. Murphy had no desire to retain the properties, she did express an interest in fulfilling the cash bequests included in the prior will of Mayme Wagner. However, the only property remaining in the estate of Mayme Wagner was the aforementioned real property. In order to avoid personal liability and yet create cash funds to fund these cash bequests, the concept of creating trusts to incur debt and personal liability was adopted. It became necessary, therefore, to identify a trust purpose. Ms. Murphy, as a consequence of her career as a legal secretary, had often remarked on the inability of law school to prepare young lawyers in the practical aspects of the practice of law and it was decided to use the balance of any property remaining to further that secondary goal. The Gertrude M. Murphy Trust (the "trust") and the Wagner-Murphy Foundation (the "foundation") were created to fill these two goals.

Respondent became a trustee for the Murphy trust and, at the same time, represented it as attorney. He likewise became a trustee for the Wagner-Murphy foundation and also represented it as attorney. One or another of respondent's law partners served as co-trustee of the trust and foundation at all times. Both agreements provided that any action had to be by mutual agreement of both trustees.

The trust was established by an agreement executed October 7, 1965. The Iowa City commercial property, valued at $100,-000, was deeded to the trust. The foundation was established by separate agreement on the same day and the farm land, worth $39,000, was deeded to form its corpus. The farm was subject to a $31,000 mortgage, so the actual value of the corpus was $8,000. Under the scheme, Gertrude Murphy was to receive the income of the trust for her life. Upon her death, the balance was to be transferred to the foundation.

The stipulation explains the purpose of the foundation:

Pursuant to the terms of the foundation agreement, the foundation property and income derived therefrom is to be used solely to teach the practical aspects of the general practice of law to duly enrolled law students at an accredited law college selected by the trustees. The foundation agreement provides that the trustees may withhold any distributions and may accumulate income for at least 15 years (until after October 7, 1980), but that the foundation property is to be ultimately distributed no later than thirty-five years (by October 7, 2001).

Starting in 1973, Gertrude Murphy was not provided with annual accountings. In 1981 she requested one which was provided to her, apparently to her satisfaction. Nevertheless, it is clear respondent did not use his best efforts either to assure the life income for Gertrude Murphy or to further the charitable purposes of the foundation. Rather, the *de facto* beneficiaries seem to have been respondent, his other clients, and his associates.

A. In April 1967, respondent and one of his law partners, who also served as trustee of the Murphy trust, loaned themselves $7,000 at 6% interest. The amount was later repaid, in part by what the stipulation describes as "offset against legal fees owing to the law firm by the trust."

B. Respondent also found the trust to be a ready source of funds for his other clients and interests. He represented four corporations: Halerbild Development Company, Monterra Investments, Inc., Monterra II Company, and Lanser, Inc. He was also a member of the board of directors and executive committee of Goodwill Industries. Respondent also invested money or has interests in Old Capitol Associates, Old Capitol Business Center Company, and Old Capitol Center Partners.

All these various corporations were benefited by respondent's access to the trust and foundation. For example, the trust sold a portion of the Iowa City commercial property to Goodwill Industries for $100,-000, payable at $630 per month with interest at 7%. The payments were equal to the payments owed on the trust property.

Under the terms of the sale to Goodwill, the entire balance was to be due on September 1, 1973. It was not paid, however, until December 12, 1974, when Goodwill sold the property to Old Capitol Associates for $155,000. Respondent explains the discrepancy in prices by pointing to a federal grant which allowed $40,000 in improvements to the property. Although respondent invested no money in Old Capitol Associates his firm served as its counsel in connection with the purchase of the property from Goodwill.

C. The remainder of the downtown property, described as the "Gringo's property," was leased until January 1975, when it was sold to Halerbild Development Company for $70,000. Respondent was still a trustee at the time, yet his firm represented both Halerbild and the trust in the transaction.

The Gringo's property was later sold to Old Capitol Associates for $85,000. Soon after the transfer Halerbild paid respondent's firm $20,000 for legal services rendered.

D. Respondent also used the foundation assets improperly. Since October 1965, respondent, one of his partners, and Gertrude Murphy each owned stock in the River Products Company. The business mined and sold gravel, rocks, aggregate, and similar products. As of January 1970, the company had 64,794 outstanding shares. Respondent owned 3,474 and Gertrude Murphy owned 714.

Stock in this company was the subject of a number of sales and transfers. Respondent sold 3,000 shares to Gertrude Murphy. She later sold 4,000 shares to the foundation; still later, she sold another 1,000 shares she had elsewhere acquired to the foundation. In September 1972, she agreed to sell 5,000 shares of the stock to Halerbild. The two contracts between her and the foundation were rescinded in October 1972. In May 1983, River Products redeemed its stock, resulting in a $31,-385.84 loss to Halerbild.

E. By what may seem strange coincidence, the Iowa highway commission (now the department of transportation) announced in December 1965 that interstate highway 518 would be constructed and that an interchange with another highway would be built upon a part of the farm which formed the principal asset of the foundation. In 1970, when the state began acquiring access rights, it became apparent to the foundation trustees that the principal value of the farm was the potential development of the highway and commercial portion of the property. It happens, however, that the proposed highway has not yet been completed.

The foundation trustees responded to this unique opportunity in behalf of other clients. The stipulation points out:

> The foundation, acting by and through its trustees ... entered into certain transactions with Halerbild Development Company. Halerbild Development Company was incorporated on July 6, 1970 by [three of respondent's clients and anoth-

er person]. [Respondent's firm prepared and filed articles of incorporation for the new venture and received a fee therefore.]

Each of the incorporators contributed $100 in capital to Halerbild Development Company for which they received stock. On July 7, 1970, this corporation held its first meeting of stockholders and directors in the law office of [respondent]. The board of directors discussed a proposed purchase of approximately 84.36 acres of farm property from the foundation. These 84.36 acres included the site of the proposed interchange of [the] new highway .... The foundation, acting by and through its trustees ..., obtained a formal appraisal of this property from a licensed appraiser, evidencing a fair market value of the property of $127,000.

The trustees and new incorporators then negotiated for the purchase of the property for $158,850 and received the deed. Under the arrangement it was agreed that Halerbild was to pay 80% of any monies received from any transfer to the foundation as payment upon the principal.

In May 1972 Halerbild sold 32.68 acres of the farm to the Iowa department of transportation for $72,900. None of this money was, as required, paid to the foundation. Rather, Halerbild used $59,900 of this amount to pay Gertrude Murphy upon the separate contract it had with her to purchase stock in the River Products Company. The balance went for other of Halerbild's expenses.

In July 1973, the foundation, by respondent and the other trustees, offset Halerbild's loss on the stock purchase contract by forgiving the interest due from it on the real estate purchase contract. The accrued interest was forgiven to July 1, 1973, for a total of $35,741.25. As "partial consideration," Halerbild made an immediate principal payment of $10,000.

F. Respondent found other improper uses for foundation assets. A total of $24,055 was loaned to Lanser Inc., a corporation owned by respondent's law partner, of which respondent was the secretary. As trustees, respondent arranged for a loan of $8,000 to Monterra Investments Inc., a corporate client of respondent's firm.

G. The earnings to Gertrude Murphy proved relatively meager. The stipulation lays the blame for long delay on incompletion of highway 518 and the redevelopment of downtown Iowa City. It then continues:

Accordingly, the trust did not generate any cumulative net income prior to February 23, 1983, and Ms. Murphy did not receive any net income distributions from the trust prior to such time. However, Ms. Murphy did receive payments of $22,700 from the trust, being the payment of the initial $15,000 promissory note along with interest income on said note in the total amount of $7,700. [The $15,000 promissory note represented an investment by Gertrude Murphy at the time the trust was established.] The final cumulative net income realized by the trust on February 23, 1983 (resulting from full payment of all contracts receivable in reimbursement of legal fees and cash advance items previously paid) [was approximately] $53,350 before reduction for allocable trustees' fees, attorneys' fees and cash advance items and other expenses ....

The total fees paid by the trust to the various law firms in which respondent was associated over the sixteen-year period amounted to $20,045.26. The total fees paid by the foundation was $26,629.52. All this money has been reimbursed in full to the trust and foundation after demand was made therefore and suit filed by the successor trustees.

II. It is apparent respondent treated the trust and foundation assets as a ready source for funding his own and his clients' purposes. He engaged in wholesale and outrageous conflicts of interest. Canon 5 is at once important and crystal clear: in the absence of client consent after full disclosure, a lawyer cannot represent a client whose business interests conflict with the lawyer's own. Iowa Code of Professional Responsibility for Lawyers DR

5–104(A). Neither can a lawyer represent clients whose interests conflict with each other. DR 5–105. Indeed, any person seeking legal counsel can expect unfettered independence of professional judgment of a lawyer whose loyalty to that person is total. DR 5–105(B); EC 5–1.

These rules are plainly in the public interest, are to be rigidly adhered to, and strictly enforced. They had their genesis in the profession itself, which urged them upon the courts. *See Matter of Frerichs,* 238 N.W.2d 764, 769 (Iowa 1976). Nearly all lawyers look upon them as helpful guides.

 Although the respondent suggests otherwise, we can find neither full disclosure to the client nor knowing consent. It is more than obvious that respondent and his clients had differing interests. It was therefore respondent's burden to establish that all the transactions were fair and equitable, and that he:

> faithfully discharged all his duties to his client, not only by refraining by any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger.

*Committee on Professional Ethics v. Mershon,* 316 N.W.2d 895, 899 (Iowa 1982) (quoting *Goldman v. Kane,* 3 Mass.App. 336, 341, 329 N.E.2d 770, 773 (1975)). Respondent did not even approach bearing this burden. On the contrary, we think it is clear that the transactions were so unfair to his clients, so long lasting, and so extensive as to demand revocation.

LICENSE REVOKED.