**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

v.

**G. Richard APLAND, Respondent.**

No. 97–2297.

Supreme Court of Iowa.

April 22, 1998.

---

G. Richard Apland, Ankeny, pro se.

Considered by HARRIS, P.J., and LARSON, CARTER, LAVORATO, and ANDREASEN, JJ.

LAVORATO, Justice.

This attorney disciplinary proceeding arises out of G. Richard Apland's representation of Dennis Vonnahme who was charged with operating while intoxicated (OWI). The Iowa Supreme Court Board of Professional Ethics and Conduct alleged Apland committed numerous ethical violations. The Grievance Commission concluded Apland committed only one of those violations and recommended a public reprimand. Although we conclude Apland committed more ethical violations than the commission found, we nevertheless agree with the commission's recommendation of a public reprimand.

Apland has not appealed from the commission's recommendation under Iowa Supreme Court Rule 118.11. Nevertheless, we review the record de novo. Iowa Sup.Ct. R. 118.10. We give respectful consideration to the commission's recommendations. We, however, ultimately decide what discipline is appropriate under the unique facts of each case. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Beckman,* 557 N.W.2d 94, 95 (Iowa 1996).

The board must prove its allegations of lawyer misconduct by a convincing preponderance of the evidence. *Id.* This burden of proof is greater than in a civil case but less than in a criminal case. *Id.*

I. *Facts.*

In April 1994, Vonnahme's wife contacted Apland to represent her husband on an OWI charge. Mrs. Vonnahme made the contact because Mr. Vonnahme is an over-the-road truck driver and was on the road at the time. Apland agreed to represent Mr. Vonnahme for a flat $5000 fee. Mrs. Vonnahme delivered the entire fee in cash to Apland. Rather than deposit the fee, Apland merely put the cash in what he described as a "portfo-

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

lio." Apland agreed to pay all expenses out of the fee.

Several days later, Mr. Vonnahme and Apland met and discussed what Apland was to do. Vonnahme made it clear that he wanted Apland to pursue the OWI charge vigorously, through trial and appeal, if necessary. Apland was also to take steps to protect Vonnahme's driver's license. In addition, there was some talk of pursuing a civil rights action against the city of Boone in connection with Vonnahme's arrest for the OWI charge. (Mrs. Vonnahme had worked as a dispatcher at one time for the city's police department, and the couple thought there was a conspiracy among law enforcement officers to harass them.) There was also some talk about a workers' compensation claim and a tax matter. The precise contours of the arrangement are difficult to tie down because Apland and Vonnahme never signed a fee agreement and Apland kept virtually no record of the arrangement.

Apland began working on Vonnahme's case. He did legal research, had various conferences in person and on the phone with the Vonnahmes, deposed four people involved in the OWI case, made several out-of-town trips for interviews and investigations, and argued Vonnahme's case in a telephone hearing with the Iowa Department of Transportation (DOT) in an attempt to save Vonnahme's driver's license.

Apland's early work focused on an initially fertile ground for defense involving the arresting officer's jurisdiction. The grounds later proved barren when we handed down a decision deciding the issue unfavorably in an unrelated case.

Apland found success in the DOT hearing. He was able to convince the DOT to grant Vonnahme a work permit. This allowed Vonnahme to continue his over-the-road trucking, despite the facts of the OWI charge and a corresponding 180-day driver's license suspension.

Vonnahme's resolve to press the OWI charge through trial later flagged. Although Apland was fully prepared to try the OWI case, Vonnahme wanted to plead guilty. (Apparently an acquaintance's conviction un-

der similar circumstances convinced Vonnahme he would lose.) Apland proceeded to negotiate a favorable plea agreement with the prosecutor: a deferred judgment, one year's probation, and ten hours of community service.

Vonnahme's interest in the civil rights claim also flagged once Apland determined the suit was baseless. As to the workers' compensation claim and the tax matter, Apland testified he told Vonnahme in the beginning that he had no expertise in these matters and would refer him to another attorney.

About six months following the guilty plea, Vonnahme demanded a return of a part of the fee. Apland testified at the commission hearing he believed the $5000 was a "flat fee" for taking Vonnahme's OWI case through trial. Vonnahme testified Apland told him his "fee would be $1000," and then it would be "$2500 if we went to a jury trial and five grand to appeal to the Supreme Court." Because the case did not "go to trial," Vonnahme believed he was owed something.

Vonnahme then asked for an accounting to determine what that "something" was. In response, Apland told Vonnahme that if he were to charge Vonnahme his hourly rate, the fees would range from $5200 to $6000 based on $150 per hour and his estimate of thirty-five to forty hours spent working on the case. In addition, Apland explained that he had already paid for the four depositions he had taken in the case. Vonnahme, however, stated he was owed at least $3000.

Later, Apland did return $2000 of the fee to Vonnahme. The payment was by way of three checks: one check for $1000, and two checks for $500 each.

Unhappy, Vonnahme complained to the Polk County Bar Grievance Commission. This entity sought information from Apland, who never responded. Vonnahme later testified in these proceedings that Apland offered to return another $1000 if Vonnahme would tell the Polk County Bar Grievance Commission the complaint had been a "mistake."

II. *Proceedings.*

Later, after the matter came to the attention of the board, it instituted these proceedings. The board charged Apland with

1. failing to put the fee in a client's trust account in violation of DR 9–102(A) (lawyer shall place client's funds in client trust account);

2. failing to promptly and fully refund the unearned portion of the fee in violation of DR 9–102(B)(4) (lawyer shall promptly pay client as requested by client all funds belonging to client);

3. misappropriating the client's funds in violation of DR 1–102(A)(3) (lawyer shall not engage in conduct involving moral turpitude), (4) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), (5) (lawyer shall not engage in conduct that is prejudicial to the administration of justice), (6) (lawyer shall not engage in any other conduct adversely reflecting on the fitness to practice law);

4. charging the client an excessive fee in violation of DR 2–106(A) (lawyer shall not charge client excessive fee);

5. failing to provide the client with an accounting of the fee in violation of DR 9–102(B)(3) (lawyer shall render accounting to client concerning client's funds);

6. attempting to obstruct the disciplinary process; DR 1–102(A)(5) (lawyer shall not engage in conduct that is prejudicial to the administration of justice); and

7. failing to respond to inquiries from disciplinary authorities about the complaint from the client in violation of DR 1–102(A)(5) (lawyer shall not engage in conduct that is prejudicial to the administration of justice).

Following a hearing at which Vonnahme, Apland, and Apland's fianceé testified, the commission rendered a decision in which it found that Apland had charged a flat fee that belonged to him as soon as he received it. For this reason, the board concluded, Apland did not misappropriate his client's funds and had no ethical obligation to deposit the fee in a client trust account, to return any portion of it to the client, or to render the client an accounting of it. The commission also found the fee was not excessive and Apland did not ask Vonnahme to drop the complaint. The commission did find that Apland failed to respond to inquiries from disciplinary author-

ities in violation of DR 1–102(A)(5) and for this recommended a reprimand.

A dissenting member thought that "flat fees" should be deposited in a client trust account. Thus, the dissenter concluded the board did establish that Apland had violated DR 9–102(A) when he did not deposit the $5000 fee in a client trust account and did not make an accounting for the funds. The dissenter, however, agreed with the reprimand recommendation because he believed Apland did provide the services agreed to in exchange for the money he received.

III. *Failure to Place Fee in Client Trust Account and Misappropriation of Client Funds.*

■ DR 9–102(A) pertinently provides:

All funds of clients paid to a lawyer . . . including advances for costs and expenses, except retainer fees paid on a regular and continuing basis, shall be deposited in one or more identifiable interest-bearing trust accounts. . . . No funds belonging to the lawyer . . . shall be deposited in trust accounts except as follows:

. . . .

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer. . . .

Read literally, lawyers are required to deposit *all* advance payment of fees in a client trust account. The only exception are retainer fees paid on a regular and continuing basis. Such a fee is commonly referred to as a "general retainer," which

is a fee for agreeing to make legal services available when needed during a specified time period. In form it is an option contract; the fee is earned by the attorney when paid since the attorney is entitled to the money regardless of whether he actually performs any services for the client.

Lester Brickman, *The Advance Fee Payment Dilemma: Should Payments Be Deposited to the Client Trust Account or to the General Office Account,* 10 Cardozo L.Rev. 647, 649 n. 13 (1989) (citing *Baranowski v. State Bar,* 24 Cal.3d 153, 164 n. 4, 593 P.2d 613, 618 n. 4, 154 Cal.Rptr. 752, 757 n. 4 (1979) and *Blair v. Columbian Fireproofing Co.,* 191 Mass.

333, 77 N.E. 762 (1906)) [hereinafter Brickman, *The Advance Fee Payment Dilemma* ]. We will have more to say about general retainers in connection with nonrefundable fees.

■ In contrast to a general retainer is a "special retainer." A special retainer covers payment of funds for a specific service. *Id.* at 649. If the client and attorney agree that the attorney shall receive the special retainer payment in advance of performing the services, then the payment is commonly referred to as an "advance fee payment." *Id.* Such a fee

> is a payment made by a client to the attorney prior to the performance of contemplated services. The attorney depletes the prepayment as he renders services. If the matter is completed or the attorney's work on the case otherwise ends, the attorney is obligated to refund the balance of the advance payment to the client.

*Id.* at 649 n. 15 (citing D.C. Bar, Op. 113, at 1 (1982); Washington State Bar Ass'n Code of Professional Responsibility Comm., Formal Op. 173, reprinted in Washington State Bar News 50 (Oct.1980); Model Code of Professional Responsibility DR 2–110(A)(3); Model Rules of Professional Conduct 1.15 (1983) [corresponding to DR 9–102]; Model Rules of Professional Conduct 1.5 cmt. C ("A lawyer may require advance payment of a fee, but is obliged to return any unearned portion.")). One commentator writes that by an almost two to one margin, authorities require deposit of advance fee payments in a client trust account. *Id.* at 650 (collecting authorities).

■ The commission thought the rule did not apply to a "flat fee," which the commission found the parties had agreed to. A fixed or "flat fee" means the fee "embraces all work to be done, whether it be relatively simple and of short duration, or complex and protracted." ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1389 (1977). Such fees are commonplace for fairly routine and standardized legal services, such as drafting a simple will or real estate document, or representing a party in an uncontested divorce proceeding. *ABA/BNA Lawyers' Manual on Professional Conduct*

41:306 (1993) [hereinafter *Lawyers' Manual* ]. Flat fees have their place. By our discussion we do not intend to discourage their use.

As to whether attorneys need to deposit flat fees in a client trust account, an opinion of the American Bar Association had this to say:

> While conceptually straightforward enough, the rule that lawyers must keep money in trust accounts when it is not their money becomes more complicated when applied to certain kinds of advance fee payments. The questionable ethical viability of non-refundable fee advances has inspired some imaginative terminology designed to characterize the advance payments in a manner that eludes the issue: retainers, non-refundable retainers, fee advances, or advanced fees, prepaid fees, *flat fees*, and minimum fees.
>
> The basic question is Whose money is it? If it's the client's money, in whole or in part, it is subject to the trust account requirements. If it is the lawyer's money, placing it into a trust account would violate the anti-commingling rule.
>
> In general, analysis turns on when the money is deemed "earned," for once money is earned it is the lawyer's. The majority of courts and ethics committees addressing the problem have looked beyond the terminology by which the fee is characterized, and have determined that fee advances are not earned when paid, and therefore must be deposited into the trust account.

*Id.* at 45:109 (emphasis added).

■ We see the flat fee as nothing more than an advance fee payment which a majority of authorities now agree must be deposited in a client trust account. This position is consistent with our case law. Funds remain the property of the client until the attorney earns them. *See, e.g., Committee on Prof'l Ethics & Conduct v. Glenn*, 390 N.W.2d 131, 132–33 (Iowa 1986) (holding that attorney misappropriates client funds when attorney keeps that which attorney has not earned). Requiring lawyers to deposit all advance fee payments in a client trust account provides a "safe harbor" approach for lawyers, which we

adopt. We hold that lawyers must deposit all advance fee payments into a client trust account.

Strong policy considerations support our position that lawyers must deposit all advance fee payments in a client trust account. This approach (1) "preserve[s] the client's property from the reach of the lawyer's creditors," (2) "preserve[s] the client's property from possible misappropriation by the lawyer," and (3) "enable[s] the client to realistically dispute a fee where the funds are already in the lawyer's possession by disallowing a self-help resolution by the lawyer and instead preserving the disputed funds intact until the dispute is resolved." Brickman, *The Advance Fee Payment Dilemma*, 10 Cardozo L.Rev. at 667. All three policy considerations place the client's interest paramount thereby emphasizing the fact that the relationship between the client and the attorney is a fiduciary one.

Requiring lawyers to deposit all advance fee payments into a client trust account is also consistent with DR 2–110(A)(3). This rule provides that "a lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned." The rule recognizes that advance fees are client funds until the attorney earns them. As one commentator notes, two additional arguments support the rule requiring deposit of all advance fee payments into a client trust account:

First, empirical data on the causes of lawyer defalcation indicates that the failure to return unearned advance fees constitutes a major disciplinary problem and generates substantial claims by clients against client protection funds. Clients often are unable to obtain the return of unearned advanced fee payments because their lawyers have either spent the money or otherwise made it unavailable to the client. A rule mandating that advance fees be deposited to the client trust account would reduce both the volume of litigation that clients pursue against lawyers for refunds of advance fee payments as well as the number of client claims against lawyers that are paid through client protection

funds, in each case saving substantial sums of money.

Second, such a rule would effectuate the intent of DR 9–102(A)(2), which allows the client to contest the amount of the lawyer's fee when funds deposited to the security account include fees claimed by the attorney. Once the client exercises her right to contest the fee, the funds may not be withdrawn until the dispute is resolved.

Lester Brickman & Lawrence A. Cunningham, *Nonrefundable Retainers Revisited*, 72 N.C. L.Rev. 1, 42 (1993) [hereinafter Brickman & Cunningham, *Nonrefundable Retainers Revisited* ].

■ Like the commission, we find that Apland charged Vonnahme a flat fee. The fee, however, was not a general retainer. Rather it was a special retainer. Vonnahme paid the fee for specific services. Because Vonnahme paid the $5000 special retainer in advance of Apland's performing the services, the fee was an advance fee payment. At the time he received the fee, Apland had not performed any services he had agreed to perform for the fee. The money still belonged to the client. For that reason, DR 9–102(A) required Apland to deposit the fee in a client trust account. His failure to do so constituted a violation of the rule.

■ Because Apland took the fee before it was earned, he misappropriated the client's funds in violation of DR 1–102(A)(3), (4), (5), and (6). *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Gottschalk*, 553 N.W.2d 322, 323–24 (Iowa 1996). The misappropriation, however, was not intentional given the uncertainty at the time about whether such fees were subject to trust account requirements.

IV. *Failure to Return Unearned Portion of Fee: Excessive Fee.*

DR 9–102(B)(4) requires a lawyer to "[p]romptly pay or deliver to the client as requested by the client the funds ... in the possession of the lawyer which the client is entitled to receive." Failure to return an unearned fee violates this rule. *Glenn*, 390 N.W.2d at 132–33.

The commission found no violation of this rule because it concluded the $5000 payment was a flat fee. As such, the commission apparently believed that the fee belonged to Apland when he received it. This finding raises the question whether nonrefundable fee advances are ethical.

■ A. *Nonrefundable fee advance.* A nonrefundable fee advance "allow[s] an attorney to keep an advance payment irrespective of whether the services contemplated are rendered." *In re Cooperman,* 187 A.D.2d 56, 591 N.Y.S.2d 855, 856 (1993). According to the *Lawyers' Manual,*

> [a] retainer can serve one of two purposes, or some combination of the two. Either it is a fee paid in advance to ensure the lawyer's availability and to compensate the lawyer for foregoing the opportunity to be hired by the client's adversary—in effect, an option—or it is an advance deposit for fees not yet earned. It may also be a hybrid, and thus harder to evaluate.

> Many courts and ethics committees have held that payments made to ensure availability are indeed earned when paid, and therefore belong to the lawyer and are not subject to trust account requirements.

*Lawyers' Manual* 45:109–10 (collecting authorities). A retainer fee paid to ensure an attorney's availability is a "general retainer" fee which we earlier referred to in division III in connection with our discussion of DR 9–102(A).

■ At least two courts have held fees are refundable notwithstanding any agreement to the contrary. *See Cooperman,* 591 N.Y.S.2d at 856 (holding that nonrefundable fee agreements are against public policy and therefore void; such agreements (1) interfere with client's right to discharge an attorney, (2) attempt to limit attorney's duty to refund promptly, upon discharge, all those fees not yet earned in violation of DR 2–110(A)(3), and (3) result in an excessive fee to the extent the fee is not earned in violation of DR 2–106(A)); *In re Conduct of Gastineau,* 317 Or. 545, 857 P.2d 136, 140 (1993) (holding attorney violated DR 2–106(A) by failing to promptly remit unearned portion of fee). Neither *Cooperman* nor *Gastineau* gives clear guidance as to the distinction between a general retainer and a special retainer. That is because neither case was dealing with a general retainer. Both were dealing with advance fee payments resulting from a special retainer. As mentioned, attorneys are allowed to keep a general retainer fee regardless of whether the attorney performs services for the client. We do, however, think *Cooperman* and *Gastineau* stand on solid ground with respect to advance fee payments resulting from a special retainer. As to those, we hold fees are refundable notwithstanding any agreement to the contrary because "[a] lawyer cannot charge a fee for doing nothing." Brickman & Cunningham, *Nonrefundable Retainers Revisited,* 72 N.C. L.Rev. at 17.

There are good reasons why advance fee payments resulting from a special retainer should be refundable. Lawyers are fiduciaries of their clients and for that reason their clients may discharge them at any time for any reason. There should be no penalty imposed upon the clients if they exercise this right. Because a nonrefundable advance fee arrangement does just that, it is "inconsistent with the trust-based quality of the unfettered discharge right." Lester Brickman & Lawrence Cunningham, *Nonrefundable Retainers: Impermissible Under Fiduciary, Statutory and Contract Law,* 57 Fordham L.Rev. 149, 189–90 (1988).

■ Before moving on to the next issue, we feel we need to address the hybrid cases—those cases where the general/special retainer distinction is less clear-cut. We agree with one commentator that we should carefully scrutinize those agreements because they may be structured in such a manner as to enable an attorney to keep the advance fee if the attorney is discharged. Brickman & Cunningham, *Nonrefundable Retainers Revisited,* 72 N.C. L.Rev. at 25. As to hybrid cases, we will presume that no part of the retainer was given for availability as that term is used in the general retainer context. In short, we will presume the arrangement is a special retainer. The attorney will have the burden to rebut the presumption by a convincing preponderance of the evidence. *See id.* at 27.

■ Here, as mentioned, the $5000 payment was not a "general retainer." Rather, as we said, it was an advance fee payment because it was for specific services to be performed in the future. We hold that a nonrefundable fee in these circumstances is void and unethical. Such a fee violates DR 2–106(A). As *Gastineau* points out,

> [a] close examination of the text and context of the excessive-fee rule demonstrates that a lawyer may violate DR 2–106(A) by failing to refund an unearned fee under certain circumstances even though the initial advance payment was not unreasonable for the task a lawyer was to perform in the future. DR 2–106(A) provides that "[a] lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee." The disjunctive use of the word "collect" means that the excessiveness of the fee may be determined after the services have been rendered, as well as at the time the employment began. Also telling in the interpretation of the scope of the rule is the fact that one factor for determining the appropriateness of the amount of a fee, stated in DR 2–106(B)(4), requires consideration of "the results obtained." That wording, at least, suggests that the work for which the fee was agreed has been completed.... "It would appear that any fee that is collected for services that [are] not earned is clearly excessive regardless of the amount...." We conclude that a lawyer violates DR 2–106(A) when he or she collects a nonrefundable fee, does not perform or complete the professional representation for which the fee was paid, but fails promptly to remit the unearned portion of the fee.

*Gastineau*, 857 P.2d at 139 (citation omitted). We think this discussion is relevant to advance fee payments. It has, however, no application to a general retainer which as we have discussed belongs to the lawyer whether or not the lawyer has performed services. Unlike advance fee payments, a general retainer is "'earned when paid' because the payment was given in consideration for availability." Brickman & Cunningham, *Nonrefundable Retainers Revisited,* 72 N.C. L.Rev. at 25.

■ **B.** *What portion, if any, of the fee was refundable?* Whether Apland had a duty to refund any part of the fee depended on whether the $5000 fee was reasonable for all of the services he performed.

As mentioned, DR 2–106(A) prohibits a lawyer from charging a "clearly excessive fee." A fee is "clearly excessive"

> when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
>
> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
>
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
>
> (3) The fee customarily charged in the locality for similar legal services.
>
> (4) The amount involved and the results obtained.
>
> (5) The time limitations imposed by the client or by the circumstances.
>
> (6) The nature and length of the professional relationship with the client.
>
> (7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
>
> (8) Whether the fee is fixed or contingent.

DR 2–106(B).

Considering the amount of services performed, the time spent, and results obtained, we agree with the commission that the board failed to prove the fee was "clearly excessive." Although Apland had no time records, we think the 35–40 hour estimate was, if not conservative, reasonable. In addition, we think the $150 per hour charge is in line with what other lawyers are charging for like services in the locality. Moreover, part of the fee covered out-of-pocket expenses such as deposition costs.

Because we find the fee was not clearly excessive, Apland had no legal or ethical

obligation to refund any part of the fee. Nevertheless, Apland did refund $2000, a sum we find he agreed to refund. Like other attorneys who find themselves in similar fee disputes with clients, Apland apparently believed the prudent thing to do was to compromise. We refuse to consider such a compromise an admission that Apland owed anything. To do so would discourage attorneys from reaching similar compromises in fee disputes with clients. We want to encourage such settlements because court suits involving fee disputes tend to discredit the profession in the eyes of the public.

We conclude the board failed to prove Apland charged a clearly excessive fee in violation of DR 2–106(A). We also conclude the board failed to prove Apland failed to return an unearned portion of the fee in violation of DR 9–102(B)(4).

### V. Failure to Provide Client With Accounting.

DR 9–102(B)(3) requires a lawyer to [m]aintain complete records of all funds ... of a client coming into the possession of the lawyer and render appropriate accounts to the client regarding them.

Advance fee payments present special problems to lawyers when it comes to accounting to the client for such payments. Lawyers accepting such payments face questions like the following: When may the lawyer withdraw funds from the trust account? What notice, if any, must a lawyer give the client when withdrawing funds? Must a lawyer give an accounting? To resolve these questions, one court requires lawyers to notify the client in writing of the time, amount, and purpose of any withdrawal together with a complete accounting. *In re Disciplinary Action Against Lochow,* 469 N.W.2d 91, 97 (Minn.1991).

We think such a rule not only protects lawyers from potentially unethical conduct but it also protects the client's interests. We hold that lawyers accepting advance fee payments must notify their clients in writing of the time, amount, and purpose of any withdrawal of the fee together with a complete accounting. No withdrawal of any part of the fee shall occur until the lawyer has rendered some services. Suffice it to say that the prudent lawyer will reduce an advance fee payment agreement to writing, spelling out its purpose, at what intervals the lawyer may withdraw a portion of the fee, and at what intervals the lawyer will render an accounting.

The record here shows that Vonnahme asked for an accounting. In his answer to the complaint, Apland admitted he never provided an itemized statement or accounting to Vonnahme. Apland could not do so because he kept no detailed billing records. Apparently, he believed, like the commission, that he had no ethical obligation to account because he thought the fee belonged to him at the time he received it.

Nevertheless, contrary to the commission, we conclude Apland violated DR 9–102(B)(3) for his failure to account to Vonnahme for the fee.

### VI. Attempt to Obstruct the Disciplinary Process.

The commission found that Apland did not ask Vonnahme to drop the complaint. The commission was in a far better position than we to assess the credibility of Apland and Vonnahme. We accept the commission's finding as our own.

We conclude the board failed to prove Apland attempted to obstruct the disciplinary process in violation of DR 1–102(A)(5).

### VII. Failure to Respond to Disciplinary Authorities.

The commission found that Apland failed to respond to the Polk County Bar Association Grievance Commission and to the board regarding Vonnahme's complaint. The record is clear that Apland failed to respond to any complaint. He admitted so. Like the commission, we conclude Apland's failure to respond was a violation of DR 1–102(A)(5). *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sullins,* 556 N.W.2d 456, 457 (Iowa 1996) (lawyer has duty to respond to local bar association ethics committee inquiries); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Humphrey,* 551 N.W.2d 306,

308 (Iowa 1996) ("A knowing failure to respond to the board's notice and inquiry is a clear violation.").

## VIII. *Discipline.*

With one exception, all of the violations resulted from Apland's handling of the fee. Because we have never before given any guidance on how to handle advance fee payments, we look upon these violations as less serious than had we given such guidance. *See Committee on Prof'l Ethics & Conduct v. Baker,* 492 N.W.2d 695, 704 (Iowa 1992). On the other hand, Apland's lackadaisical bookkeeping practices served only to compound his problems.

Apland is currently not practicing law. We suspended his license because he had not complied with Supreme Court Rule 121 relating to continuing legal education and annual fee requirements. Otherwise, his record is clear and the commission was unaware of any other ethical violations.

Given the circumstances, we are inclined to agree with the commission that a public reprimand is in order.

Costs are assessed to Apland under Iowa Supreme Court Rule 118.22.

**ATTORNEY REPRIMANDED.**