**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

v.

**Eldon J. WINKEL, Respondent.**

**No. 99–626.**

Supreme Court of Iowa.

Sept. 9, 1999.

Norman Bastemeyer and David J. Grace, Des Moines, for complainant.

Eldon J. Winkel, Algona, pro se.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and SNELL, JJ.

NEUMAN, Justice.

This is the third time respondent, Eldon J. Winkel, has been before this court for violating the Iowa Code of Professional

Responsibility for Lawyers. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Winkel,* 541 N.W.2d 862 (Iowa 1995); *Committee on Prof'l Ethics & Conduct v. Winkel,* 415 N.W.2d 601 (Iowa 1987). In the case now before us, the grievance commission found Winkel guilty of conduct violating DR 5–105(B) (failing to refuse proffered employment conflicting with representation of another client), DR 2–110 (withdrawal from representation without completing work, to prejudice of client), and DR 9–102 (failure to deposit advance fee for fees in trust account). Complainant, the Iowa Supreme Court Board of Professional Ethics and Conduct (board), contests only the commission's recommended sanction of public reprimand. Given Winkel's prior history, it urges us to impose a stiffer penalty.

The matter is before us for review in accordance with Iowa Supreme Court Rule 118.10. Our review is de novo. *Committee on Prof'l Ethics & Conduct v. Leed,* 477 N.W.2d 390, 392 (Iowa 1991). We agree with the board's view that issuing yet another reprimand would do little to strengthen the public's confidence in the disciplinary system or deter Winkel, and others, from like conduct in the future. We therefore order a two-month suspension of Winkel's license to practice law.

## I. Background Facts and Proceedings.

The board's complaint centers on Winkel's relationship with a client named Michael Reimers.[1] In December 1996, Reimers and his wife, Dawn, retained Winkel to represent them in a chapter 7 bankruptcy proceeding. The Reimers paid Winkel a $600 fee, plus a $175 filing fee, when the

bankruptcy petition and schedules were signed. Winkel promptly deposited the entire sum in his office operating account. He attended the first (and only) meeting of creditors in late January. Winkel negotiated reaffirmation agreements with some of Reimers' creditors. According to Michael Reimers, Winkel's secretary advised that if any of his creditors had questions, they should be told to call Winkel's office directly.

These negotiations were still in process on February 12, 1997, when Michael Reimers was involved in an auto collision with Jake Sweers. Sweers was evidently at fault in the accident, having run a stop sign. Reimers suffered substantial injuries including a shattered right pelvis, broken ribs, and extensive facial lacerations. He was hospitalized nine days and accumulated $30,000 in medical bills.

Sweers, meanwhile, anticipated a lawsuit and contacted Winkel about defending him. Winkel agreed and met with Sweers a week later to help complete the state-required accident report. He entered a not-guilty plea on Sweers' behalf in connection with the traffic charge. He also engaged an accident reconstruction expert, concerned that Sweers—who was uninsured but owned substantial assets—would be exposed to substantial liability for his role in the accident.

Winkel maintains he had no clue that Michael Reimers was the person Sweers had injured until late February 1997, when Sweers gave Winkel a letter he received from James Fitzsimmons, Reimers' personal injury lawyer. Winkel replied on Sweers' behalf, confirming that he would be representing him in any litigation and suggesting that Fitzsimmons or his part-

---

1. The board also charged Winkel with engaging in prohibited ex parte communication with a judge in connection with an unrelated divorce case. The alleged ethical breach involved Winkel's failure, posttrial, to send a copy of a proposed visitation schedule sought by the judge to opposing counsel. Opposing counsel did not complain, but his client did. The grievance commission discerned no sub-

versive motive in Winkel's conduct. The lawyers had communicated at length about visitation, as evidenced by the similarity in the schedules proposed by each of them. The board has not appealed that portion of the commission's ruling. We agree that the violation, if any, was de minimis and give it no further attention.

# 458

ner could finish up the remaining details of Reimers' bankruptcy. In his response, Fitzsimmons' partner, James McGuire, declined to get involved in the bankruptcy and observed that Winkel's concurrent representation of these opposing parties appeared to him an obvious conflict of interest.

Winkel's and Reimers' reactions to this state of affairs is telling. Winkel recognized the conflict of interest but maintained the mixup was "totally innocent" on his part. In his words, he "had to get out of the situation the best I could." Believing Reimers had been demanding more in the way of services in the bankruptcy than Winkel had agreed to, and having already spent several hours representing Sweers, he decided to unilaterally withdraw as counsel in the bankruptcy proceeding. He believed Reimers could negotiate the unresolved reaffirmation issues himself.

Reimers, who ultimately lodged a complaint with the board, described his reaction this way:

My initial reaction was anger. Then I felt very betrayed and let down. I didn't know what to do anymore about the bankruptcy. I had a lot going on. I was out of work. I had just gotten out of the hospital. I was in an accident. Mr. Sweers didn't have any insurance. So it was just a lot more stress on me than I needed right then.

Despite these misgivings, Reimers successfully concluded the bankruptcy on his own. His debts were discharged shortly after Winkel withdrew. Winkel, meanwhile, returned $100 of the original fee. Three months later, however, he deposed Reimers in the personal injury litigation. Inquiring about the extent of Reimers' injuries, Winkel asked if he had driven his motorcycle to the deposition. This line of questioning disturbed Reimers greatly. Reaffirmation of his motorcycle debt had been an issue dealt with by Winkel in the bankruptcy. He was stunned by Winkel's attempt to use that information to Sweers' advantage. Moreover, he was too injured

to drive either a motorcycle or a car; his wife had driven him to the deposition.

Further facts will be detailed as they pertain to the issues under review.

## II. Ethical Issues.

■ A. *Concurrent representation followed by unilateral withdrawal.* The board charged, and the commission found, that Winkel's concurrent representation of Reimers and Sweers violated DR 5–105. In a nutshell, this disciplinary rule prohibits a lawyer from representing clients with conflicting interests. *Committee on Prof'l Ethics & Conduct v. Oehler,* 350 N.W.2d 195, 199 (Iowa 1984). The rule focuses on the threat posed to the lawyer's "exercise of independent professional judgment in behalf of a client" when two clients' differing interests come into play. Iowa Code of Prof'l Responsibility DR 5–105. A lawyer whose independent judgment is compromised cannot fulfill the client's expectation of undivided loyalty. *See Oehler,* 350 N.W.2d at 199. The rule does provide, however, that a lawyer may represent multiple parties if the lawyer "can adequately represent the interest of each and if each consents to the representation after full disclosure...." Iowa Code of Prof'l Responsibility DR 5–105(D).

Winkel contends he should not be faulted for taking on the representation of clients with disparate interests because he did so innocently, not knowingly. Building on this questionable excuse, he contends he was justified in retaining the new client and abandoning the former because he had already put in five hours on the new client and only "trivial" matters remained to be concluded for Reimers. He then asserts his belief that "the matters were unrelated and, therefore, no advantage or disadvantage accrued as a result of the continued representation of Sweers."

Had Winkel sought and received Reimers' and Sweers' consent to proceed in this fashion, his argument might carry some weight. *See* Iowa Code of Prof'l Responsi-

bility DR 5–105(D) (permitting multiple representation in limited circumstances). Reimers, however, plainly wanted Winkel to conclude the legal matter for which he had been paid in full. Although the record supports Winkel's claim that little remained to be done in the bankruptcy, the action clearly had not been concluded. In Reimers' eyes, the remaining matters were not "trivial." His ability to finalize agreements with his creditors had been complicated substantially as a result of his injuries, the destruction of his vehicle, and mounting medical debts. Although attorneys Fitzsimmons and McGuire conveyed these concerns to Winkel, and urged him to help his client resolve them, Winkel's written response reveals a startling indifference to Reimers' problems. His indifference, we believe, demonstrates the impaired judgment and betrayal of loyalty addressed by DR 5–105(B).

Ethical Consideration 2–33 of our Code of Professional Responsibility plainly requires that "lawyers who undertake representation complete the work involved." A companion ethical consideration cautions that "[a] lawyer should not withdraw without considering carefully and endeavoring to minimize the possible adverse effect on the rights of the client and the possibility of prejudice to the client as a result of withdrawal." Iowa Code of Prof'l Responsibility EC 2–34. A lawyer who disregards these ethical norms and unilaterally withdraws from representation to the client's prejudice violates DR 2–110. The board established that violation here.

B. *Trust account violation.* By way of amended complaint, the board also charged Winkel with violating DR 9–102(A). That disciplinary rule states that all client funds, including advances for costs, shall be deposited in an interest bearing trust account. Iowa Code of Prof'l Responsibility DR 9–102(A). Because the $775 paid by the Reimers in early December covered filing fees not applied until later in the month as well as legal services not concluded for several months, the

board argues the funds rightly belonged in Winkel's trust account. Winkel disagrees, claiming the $600 was a "flat fee" and virtually all of the work on the bankruptcy was concluded with the filing of the chapter 7 petition and schedule.

▆ The controversy is controlled by our recent decision in *Iowa Supreme Court Board of Professional Ethics & Conduct v. Apland,* 577 N.W.2d 50 (Iowa 1998). There we observed that a "flat fee" is no more than an "advance fee" which, because it is not yet fully earned, must be deposited in a client trust account. *Apland,* 577 N.W.2d at 55–56. A lawyer who takes a fee before it is earned effectively misappropriates the client's funds. *Id.* at 56. Recognizing that uncertainty had surrounded the determination of whether "flat fees" were subject to trust account requirements in Iowa, we deemed the misappropriation in *Apland* "not intentional." *Id.* Subsequent decisions have made plain that such infractions will be regarded more seriously in the future. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Torgerson,* 585 N.W.2d 213, 214 (Iowa 1998) (sanction imposed in *Apland* and *Torgerson* "should not be understood as precedent for future similar misconduct when attorneys will have the guidelines of these holdings").

These decisions make clear that Winkel violated DR 9–102 when he deposited all of the Reimers' $775 advance payment in his office operating account, rather than his trust account. The seriousness of Winkel's misstep, however, is minimized by the fact that his conduct predated *Apland.*

### III. Sanction.

In recommending a public reprimand for Winkel's ethical breaches, the commission's report states that it considered Winkel's two prior reprimands but found "little in common" between the prior cases and this one. It did observe that "fee collection and personal benefit" were the "loose connectors" between the three cases. Yet these commonalities, it seems,

did not lead the commission to recommend a more serious sanction.

 While we give respectful consideration to the commission's findings and recommendations, we are not bound by them. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hoffman,* 572 N.W.2d 904, 907 (Iowa 1997). The fact that Winkel has been reprimanded twice by this court for unethical conduct suggests something more than a reprimand is demanded. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Plumb,* 589 N.W.2d 746, 749 (Iowa 1999) (imposing suspension where prior reprimands failed to improve lawyer's reckless practice). We are fortified in that view by the nature of Winkel's previous misconduct. In 1987, we publicly reprimanded him for woeful neglect in probating a sizeable estate while taking his full fee six years before the estate was closed, two years before the fee was approved by the court. *Winkel,* 415 N.W.2d at 603. We again reprimanded Winkel in 1995 for participating in the drafting of a will naming him as a beneficiary. *Winkel,* 541 N.W.2d at 864. Although he reportedly protested the bequest, he did not disclaim it until after the decedent's daughter filed a will contest. *Id.*

We recognize in these decisions a disturbing pattern of putting a personal agenda ahead of a client's needs. Happily, Winkel's ethical breaches have never proven disastrous to his clients. His indifference to the rules has nevertheless contributed to his clients' overall disillusionment with the legal profession. We trust a suspension will encourage Winkel to improve his practice in the future, thereby restoring the public's confidence in the profession.

We therefore suspend Eldon Winkel's license to practice law in this state indefinitely, with no possibility of reinstatement for two months. This suspension shall apply to all facets of the practice of law. *See* Court R. 118.12. Upon application for reinstatement, the respondent shall furnish proof that he has complied with the notification and disengagement requirements of rules 118.13 and 118.18. Costs are assessed to the respondent.

**LICENSE SUSPENDED.**