### IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS & CONDUCT, Complainant,

v.

### Ronald L. HANSEL, Respondent.

### No. 96–1814.

Supreme Court of Iowa.

Jan. 22, 1997.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

Ronald L. Hansel, Lucas, pro se.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and ANDREASEN, JJ.

LAVORATO, Justice.

The Iowa Board of Professional Ethics and Conduct charged attorney Ronald L. Hansel with two counts of ethical violations. The first count dealt with Hansel's dealings with his lender bank. The second count dealt with his handling of client funds that were entrusted to him for the settlement of a lawsuit and his alleged failure to carry out the settlement. Both counts also dealt with Hansel's alleged failure to respond to board inquiries about these transactions.

Following a disciplinary hearing, a division of the Iowa Supreme Court Grievance Commission cleared Hansel of any intentional wrongdoing in his dealings with the bank. The commission, however, found that Hansel had violated ethical rules in (1) his handling of client funds entrusted to him for the settlement of the lawsuit, (2) failing to carry out the settlement agreement, and (3) failing to respond to the board inquiries.

The commission recommended we suspend Hansel's license to practice law for a period of three months and impose several conditions for his reinstatement. Because we think the sanction recommended is not adequate under the circumstances, we suspend Hansel's license to practice law in this state for a period of three years from the date of this opinion. In addition, we impose several conditions for Hansel's reinstatement.

 Hansel has not appealed from the commission's recommendation under Iowa Supreme Court Rule 118.11. Nevertheless, we review the record de novo. Iowa Sup.Ct. R. 118.10. We give respectful consideration to commission recommendations. We, however, ultimately decide what discipline is appropriate under the unique facts of each case. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Beckman*, 557 N.W.2d 94 (Iowa 1996). The board must prove its allegations of lawyer misconduct by a convincing preponderance of the evidence. *Id.* This burden of proof is greater than in a civil case but less than in a criminal case. *Id.*

Hansel is a farmer as well as an attorney. He has practiced law in Iowa since 1986. At the time of the events in question he had an office in Milo. At the time of the disciplinary hearing he was forty-one years old. Before practicing law, he farmed full time.

I. *Dealings with the Bank.*

 In 1993 and 1994 Hansel owed several hundred thousand dollars to Midwest Heritage Bank of Chariton, Iowa. Midwest had a perfected security interest in all of Hansel's crops, livestock, machinery, equipment, and

in "all rights to payment by or through the Commodity Credit Corporation or the ASCS." "ASCS" payments, in this case, were disaster relief payments for Hansel's 1993 losses and were made by the Warren County Agricultural Stabilization and Conservation Office.

In 1993 and 1994 Hansel was in default on his debt to Midwest and entered into a repayment agreement with the bank on June 14, 1994. Hansel drafted the agreement. The agreement required Hansel to sell all 1993 calves on hand within thirty days and apply the proceeds to the Midwest debt. The agreement also required Hansel to list his real estate for sale and to collect payment for 4000 bushels of 1993 corn and apply the proceeds to the Midwest debt. The agreement further provided that Hansel was to apply $15,000 of the "expected" ASCS payments to the Midwest debt.

A. *The ASCS payments.* In negotiating the repayment agreement, Hansel told Midwest that he had not received the ASCS payments and that he expected $15,000. Hansel admitted at the disciplinary hearing, however, that at the time he had in fact already received between $38,000 and $43,000 in payments. (The checks totaled about $43,000, but Hansel claimed he may have given back one of the checks to the Warren County ASCS.) Hansel admitted that he cashed the checks and used the proceeds for purposes other than payment of the bank loans, including contract payments on land he was purchasing from third parties.

In late June 1994, Midwest learned from the Warren County ASCS office that Hansel had received the payments.

B. *The livestock sales.* Midwest representatives testified at the disciplinary hearing that they had told Hansel in 1993 that (1) he was to apply the proceeds from the sale of Midwest collateral to his indebtedness; (2) he was not to use the proceeds for crop inputs or other purposes; and (3) once such proceeds were applied, the bank would decide Hansel's appropriate operating expenses. Hansel, the representatives claimed, was not to use the proceeds himself to pay directly for operating or other expenses. The security agreements provided that Han-

sel's failure to apply the proceeds from sale of collateral as Midwest directed rendered the sale unauthorized.

In contrast, Hansel testified that he and other farmer-debtors commonly controlled the use of proceeds from the sale of collateral without any objection from the bank.

Midwest notified Humeston Livestock Auction, where Hansel sold most of his cattle, that it had a security interest in Hansel's livestock. When Midwest gave such notice is not clear in the record. After this notice, however, Humeston Livestock issued checks in both Hansel's name and Midwest's name.

Sometime later—in 1994—Hansel began selling livestock in his father's name. Midwest did not learn of the sales until the fall of 1994. Very little of the cattle proceeds made it to Midwest. Hansel admitted applying the proceeds instead to (1) contract payments or farmland purchases, (2) wages for hired help, and (3) crop inputs. The proceeds from the sale of the cattle amounted to more than $30,000.

In July 1994, after learning of the ASCS payments, Midwest officials visited Hansel's farm with Hansel. When Midwest officials asked about which cattle were Hansel's, Hansel lied and indicated cattle that were not his. In truth, the cattle belonged to a neighboring farmer. Several days later Midwest called in Hansel's loan.

The complaint charged that as to the ASCS payments and the sale of the cattle, Hansel violated Iowa Code of Professional Responsibility for Lawyers DR 1–102(A)(3) (lawyer shall not engage in illegal conduct involving moral turpitude) and (4) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation). The commission, however, found the board failed to prove by a convincing preponderance of evidence that Hansel's dealings with Midwest violated DR 1–102(A)(3) and (4) by intentional conduct. On our de novo review of the record, we disagree and find that the board did prove the violations by a convincing preponderance of the evidence.

Other than preparing the repayment agreement, Hansel was not acting as a law-

yer in his dealings with Midwest. This, however, makes no difference because lawyers "do not shed their professional responsibilities in their personal lives." *Committee on Prof'l Ethics & Conduct v. Gross,* 322 N.W.2d 82, 83 (Iowa 1982) (respondent-attorney acted as corporate fiduciary rather than as a lawyer; nevertheless lawyer violated ethical rules when he failed to escrow investment funds as required by option agreement and used money to pay his own salary and other expenses).

As mentioned, DR 1–102(A)(3) prohibits lawyers from engaging in illegal conduct involving moral turpitude. "Moral turpitude" in the context of attorney misconduct means illegal conduct done with a fraudulent or dishonest intent. *Committee on Prof'l Ethics & Conduct v. Cody,* 412 N.W.2d 637, 639 (Iowa 1987).

Under the repayment and security agreements, all of the ASCS payments were Midwest collateral. Contrary to Hansel's contention, we find that Midwest never authorized him to apply those payments to anything other than his debt to Midwest. Nevertheless, he admits receiving between $38,000 and $43,000 in ASCS payments and using those proceeds for purposes other than payments on his debt to Midwest.

Under the repayment and security agreements, Hansel's livestock was also Midwest collateral. Hansel sold cattle belonging to him in his father's name, received proceeds from such sales to the tune of $30,000, and failed to apply any of the money to his debt to Midwest. We find as to these transactions that Midwest never authorized the sales in the father's name, nor authorized Hansel to use the $30,000 for anything other than his debt to Midwest.

The unauthorized use of the ASCS payments and proceeds from the sale of the cattle amounted to a conversion of Midwest collateral and was dishonest. *See* Iowa Code § 714.1(5) (defining theft to include "dispo[ing] of property in which someone else has a security interest, with intent to defraud the secured party.")

As mentioned, DR 1–102(A)(4) prohibits lawyers from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. On three different occasions, Hansel was deceitful in his dealings with Midwest. The first time occurred when he told Midwest that he had not received the ASCS payments when in fact he had received between $38,000 and $43,000. The second time occurred when he told Midwest certain cattle belonged to him when in fact the cattle belonged to another farmer. The third time occurred when he sold his cattle in his father's name, causing Humeston Livestock to omit Midwest's name from checks for the sales' proceeds.

C. *Failure to respond to board inquiries.* On July 23, 1995, the board sent Hansel an initial notice of complaint about the conversion of Midwest collateral. Hansel made no response. A month later, the board sent him a second notice by restricted certified mail, but Hansel did not claim the notice. The Ethics Administrator wrote Hansel, reminding him that a failure to respond is an ethical violation. Hansel ignored that letter too.

We find that Hansel's failure to respond to board inquiries violated DR 1–102(A)(5) (lawyer shall not engage in conduct prejudicial to the administration of justice) and (6) (lawyer shall not engage in any other conduct reflecting on lawyer's fitness to practice law). *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sather,* 534 N.W.2d 428, 431 (Iowa 1995).

II. *Handling of Client Funds and Settlement Agreement.*

Hansel represented Don Russell (a close personal friend) and Raymond and Suzanne Wilson, who were defendants in a lawsuit brought by Lou Bingley. Attorney Stuart Nielsen represented Bingley. In September 1995, Hansel wrote Nielsen and offered to settle the case for $1000. Nielsen telephoned Hansel and accepted the offer provided the defendants also pay the court costs. Hansel agreed.

Bingley had paid $707.35 in court costs. This represented the amount the defendants were to reimburse her pursuant to the settlement. The docket showed other costs: a deposition bill for $372.60 and a service fee of $20.45. The docket also showed that Hansel

had paid the deposition bill and his former law partner had paid the service fee. Total costs in the case were therefore $1100.40.

To satisfy his portion of the settlement Don Russell purchased a money order from the Community State Bank for $1000. Because the Wilsons had advanced $520 in costs to Hansel, Russell and the Wilsons agreed that Russell would advance the principal settlement amount and that they would settle between themselves later. Russell gave the $1000 money order to Hansel for delivery to Nielsen. Several weeks later Russell asked Hansel if he had sent the money order to Nielsen. Russell testified that Hansel said that "he had taken care of it" or "would soon take care of it." Hansel testified that he told Russell that he would soon take care of it.

Hansel also received a check from the Wilsons for $1000. The check was dated September 14, 1995. The check was for Bingley's court costs which, however, were only $707.35. As mentioned, the Wilsons had already advanced Hansel $520 for costs. The $520 was for a deposition the cost of which had only amounted to $372.60.

In December Nielsen tried to contact Hansel because Nielsen had not received any settlement payment from him. Nielsen could not reach Hansel so he called the Wilsons. Raymond Wilson told Nielsen he had sent $1000 for the costs to Hansel in September.

On December 12 Russell telephoned Nielsen and told him that he had given his $1000 settlement payment to Hansel in September. Following this telephone conversation, Russell immediately stopped payment on the $1000 money order and purchased a second one, which he sent to Nielsen.

Later in the month, Nielsen obtained a copy of Russell's first money order. The order was purportedly endorsed by Nielsen and Bingley. The endorsements were forged.

The last time Nielsen spoke with Hansel was on September 8, 1995, the day the settlement was reached. Hansel never gave Nielsen any explanation for his failure to forward the payments from Russell and the Wilsons. Nor did Hansel ever contact Russell with an explanation.

The evidence shows that the first money order from Russell was deposited in Hansel's personal account at AmerUs Bank. The $1000 money order was deposited with an unrelated check for $500. Hansel testified he had no knowledge of how the forged endorsements appeared on the money order. Hansel, however, admitted the deposit was made at his direction. The deposit ticket had Hansel's initialed instruction that Sandie Cate (a close personal friend of Hansel's) could receive $500 of the $1500 total. Cate apparently took the deposit to the bank and received the $500.

The remaining funds were later withdrawn from this account. Hansel testified that an employee made unauthorized withdrawals from the account both before and after he fired her for making the withdrawals.

Hansel gave several stories about why he did not forward the settlement checks to Nielsen. In a response to a request for admissions, Hansel gave this explanation:

> September 1995, after entering into the arrangement with Mr. Nielsen, I pressured Don Russell, who was a close friend of mine, to come up with the money to settle this case. . . . I was somewhat concerned whether he would go through and settle the case. He has been experiencing financial trouble over a long period of time and I was afraid that he would not have the $1000. Shortly after receiving this check or money order, I had learned from Mr. Russell's bank that he had stopped payment on it. So I kept the check and decided to wait until it was made good. I talked to Mr. Russell on several occasions after this date through the fall of 1995. I had no intention of doing anything regarding this until December of 1995.

Russell demolished this explanation when he testified that he had no problem "making the check good" because it was a cashier's check or money order that he had paid for. The evidence also shows that Russell stopped payment on December 12, several months *after* he had sent the money to Hansel. This evidence is contrary to Hansel's explanation that Russell had stopped payment in September. Additionally, Russell testified that the

only time he talked to Hansel about the money order was when he asked Hansel if he had forwarded the payment to Nielsen. In his testimony, Hansel conceded that he did not see Russell during the fall of 1995.

At the disciplinary hearing, Hansel testified that he was not sure why he did not send the money order to Nielsen and that it was negligence on his part. Later, Hansel testified that he did not send the money order to Nielsen immediately "[b]ecause at the time I didn't have the releases and whatever prepared." Later still, Hansel testified that "at the time I just lost track of everything. I was sick."

As to the Wilson's $1000 check, Hansel testified he did not know what happened to the money. At this point Hansel was shown the reverse side of the check, which showed it had been presented at Norwest Bank. He then testified that he had a trust account at Norwest and that the funds may still be in that account. Earlier, however, Hansel had testified that his trust account was closed at the beginning of 1995.

Without question, this evidence establishes that Hansel failed to account for clients' funds in his possession, failed to maintain clients' money separately from his own, failed to properly follow through with the settlement, and lied to his client when asked if he had sent the settlement check to Nielsen. We find it intolerable that in response to a request for admission Hansel concocted a story that his client Russell was responsible for Hansel's failure to send the $1000 check to Nielsen. We find it incredible that at this late date Hansel does not know what happened to the Wilsons' $1000. In addition, we are not so naive to believe Hansel has no knowledge about the forged endorsements on the Russell money order.

We find this conduct constitutes a violation of the following disciplinary rules: DR 7–101(A)(1) (lawyer shall not intentionally fail to seek client's lawful objectives); DR 7–101(A)(3) (lawyer shall not prejudice client in the course of professional relationship); DR 9–102(A) (lawyer shall deposit client funds paid to lawyer in an identifiable trust account); DR 1–102(A)(3) (lawyer shall not engage in illegal conduct involving moral turpi-tude); and DR 1–102(A)(4) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).

Hansel also failed to respond to board inquiries on two occasions about his handling of the settlement funds and his failure to complete the settlement. Hansel's failure to respond violated DR 1–102(A)(5) (lawyer shall not engage in conduct prejudicial to administration of justice) and DR 1–102(A)(6) (lawyer shall not engage in any other conduct adversely reflecting on lawyer's fitness to practice law).

### III. *Sanction.*

The commission recommended that we suspend Hansel's license for three months "with the requirement that he not apply for reinstatement until he has sufficiently recovered from his illness, and also that satisfactory proof is made that the Wilson funds have been accounted for and the Bingley case settlement completed." Four factors influenced the commission's recommendation for the three month sanction. First, the commission found that the committee failed to prove any intentional wrongdoing in Hansel's dealings with Midwest. As previously explained, we have felt obliged to find otherwise.

Second, the commission indicated that it was sympathetic to Hansel's physical problems with cancer and its treatment. Hansel testified that the severe emotional and physical distress caused by the disease and his treatment contributed to the events in this case.

We too are sympathetic to Hansel's health problems. They are serious and debilitating. Nevertheless, we have repeatedly held that we will not *excuse* ethical violations because of an attorney's ill health, emotional problems, personality disorders, or the general stress of a busy law practice. *Committee on Prof'l Ethics & Conduct v. Hoffman*, 402 N.W.2d 449, 451 (Iowa 1987). We can understand how an illness may cause a person to be apathetic and inattentive. But illness no matter how serious is not an excuse for dishonesty.

We must keep in mind the purposes of attorney disciplinary proceedings and give them our foremost consideration. Such purposes include protecting the courts and the public from persons unfit to practice law, vindicating public confidence in the integrity of our system of justice, and deterring other lawyers from similar misconduct. *Committee on Prof'l Ethics & Conduct v. Behnke,* 486 N.W.2d 275, 278 (Iowa 1992).

Turning to the third factor, we note the commission believed that Hansel took no client money from his personal account. The commission also believed that the forged endorsements on the Russell money order were "made by another person for which we cannot hold him responsible." The evidence may fall short of establishing that Hansel took client money for his own use. The evidence, however, is clear that his poor accounting made it possible for an employee, over a period of time, to clean out Hansel's personal account where client funds were deposited.

Given the circumstances, we find it incredible that Hansel would have no personal knowledge of the forged endorsements on the Russell money order. The deposit containing the money order was made at Hansel's direction, and the deposit slip had Hansel's initialed instruction that Cate could receive $500 of the $1500 total deposit.

Last, the commission gave consideration to Hansel's testimony that he does not intend to practice law unless he can recover sufficiently from cancer. What should dictate the sanction in this case is the nature, number, and seriousness of the ethical violations, not whether Hansel intends to practice law anymore. The nature of the violations implicates Hansel's honesty and integrity, two core values of our profession. As we have said,

> [f]undamental honesty is the base line and mandatory requirement to serve in the legal profession. The whole structure of ethical standards is derived from the paramount need for lawyers to be trustworthy. The court system and the public we serve are damaged when our officers play fast and loose with the truth. The damage occurs without regard to whether mislead-

ing conduct is motivated by the client's interest or the lawyer's own.

*Committee on Prof'l Ethics & Conduct v. Bauerle,* 460 N.W.2d 452, 453 (Iowa 1990). Hansel has also committed not one but several violations, and those violations are serious.

Notwithstanding the respectful consideration we always pay to the recommendation of our commission, we cannot agree with the recommended three month suspension. Given the circumstances of this case and given the nature, number, and seriousness of the violations, we think a three-year suspension is more appropriate.

We order that Ronald L. Hansel's license to practice law in this state is suspended indefinitely with no possibility of reinstatement for three years from the date of this opinion. This suspension shall apply to all facets of the practice of law. *See* Iowa Sup. Ct. R. 118.12. Upon application for reinstatement, Hansel shall have the burden to prove he has not practiced law during the period of suspension and that he meets the requirements of Iowa Supreme Court Rule 118.13. In addition, Hansel shall have the burden to prove that he has (1) paid any entity which has suffered a loss because of the forged endorsements on the Russell money order, (2) accounted for the Wilson funds, and (3) completed the settlement with Bingley.

Costs are assessed to Hansel under Iowa Supreme Court Rule 118.22.

**LICENSE SUSPENDED.**

All justices concur except NEUMAN, J., who concurs in part and dissents in part.

NEUMAN, Justice (concurring in part and dissenting in part).

I join the majority's opinion with respect to parts II and III, and the sanction imposed. I respectfully dissent, however, from the conclusions drawn in part I. Although Hansel's conduct in this private matter was patently dishonest, I do not believe the record supports a finding of conduct violating DR 1–

102(A)(3) (illegal conduct involving moral turpitude) by the requisite quantum of proof.