**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

v.

**Stephen W. ALLEN, Respondent.**

No. 98–1326.

Supreme Court of Iowa.

Nov. 25, 1998.

Norman G. Bastemeyer and David J. Grace, Des Moines, for complainant.

Mark McCormick of Belin Lamson McCormick Zumbach & Flynn, P.C., Des Moines, for respondent.

Considered by CARTER, P.J., and LAVORATO, NEUMAN, SNELL, and CADY, JJ.

LAVORATO, Justice.

This case arises out of attorney Stephen W. Allen's actions while he was a guardian and a conservator for his aunt. The Iowa Supreme Court Board of Professional Ethics and Conduct alleged Allen took fees from the conservatorship without prior court approval, made unauthorized gifts to himself, and otherwise took conservatorship funds and converted them to his own use. The Grievance Commission found that the board had established the violations alleged but only recommended a public reprimand.

We determined from a preliminary review of the record that a greater sanction, up to and including license revocation, might be appropriate. We therefore concluded that Allen should be permitted to appear before this court and show cause why a more severe discipline should not be imposed. We limited arguments of the parties to the record made before the commission. After carefully reviewing the record and considering the arguments of counsel, we suspend Allen's license to practice law in this state for a period of one year from the date of this opinion.

■ We review the record de novo. Iowa Sup.Ct. R. 118.10. We give respectful consideration to the commission's recommendations; however, we ultimately decide what discipline is appropriate under the unique facts of each case. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Apland*, 577 N.W.2d 50, 52 (Iowa 1998). The board must prove its allegations of lawyer misconduct by a convincing preponderance of the evidence. *Id.* This burden of proof is greater than in a civil case but less than in a criminal case. *Id.*

## I. Background Facts.

Allen has practiced law in Onawa, Iowa since 1969. He has served as county attorney and assistant county attorney for Monona County. He is a part-time magistrate and has served in that position since 1993. Allen is a member of numerous professional organizations and is involved in many community activities. He has a private practice with emphasis on mediation, real estate transactions, probate, and tax.

On July 26, 1993, Allen was appointed as guardian and conservator for his aunt, Louise W. Gillespie, who at that time was eighty-seven years old. He was appointed on a voluntary petition filed by Louise. Allen was also designated as the attorney for the guardianship and the conservatorship. The petition for guardianship and conservatorship alleged that Louise had real property in the amount of $50,000, personal property in the amount of $500,000, and that she received annual income in the amount of $35,000.

On September 16, 1993, Allen paid himself $3530 in fees from conservatorship assets. The payment was without prior court approval. The following month Allen applied to the court for fees in the amount of $3530 to cover the fees he paid himself in September. Louise signed a waiver of notice of hearing on the application. In the waiver, Louise acknowledged receipt of the application, approved it, and consented to an order approving the application. The court approved Allen's fees in the amount of $2630 but disallowed $900 in fees for travel time.

In January 1994, Allen again paid himself fees from conservatorship assets without pri-

or court approval. The payment this time was for $3829.66.

The following month, Allen applied to the court for fees in the amount of $3829.66 to cover the fees he paid himself in January. Louise again signed a waiver of notice of hearing. In the waiver, Louise consented to an order approving the fees. Concerned about the frequency of the claims for attorney fees and the substantial amounts requested, the court set this application for hearing. Following a hearing in March on the fee application, the court entered an order approving the fee requested. The order, however, stated:

> Mr. Allen advised the court that the fees were somewhat high at this point in time because of the initial activities associated with setting up the guardianship and conservatorship. He does not anticipate fees of this level to continue.

Notwithstanding his assurance to the court, Allen paid himself attorney fees on April 14, 1994—again without court approval. The fee this time was $3520.

In October, Allen filed the first annual report in the conservatorship, covering the period from August 1, 1993 through July 31, 1994. An exhibit to the report listing deposits and withdrawals reveals the three fees previously mentioned. Louise signed a waiver of notice of hearing on the report in which she acknowledged receiving a copy of the report, waived accounting, and consented to the court entering an order approving the report. The district court thereafter approved the report and continued the guardianship and the conservatorship.

On August 18, 1995, Allen filed the second annual report, covering the period from August 1, 1994 to July 31, 1995. The exhibit listing deposits and withdrawals shows a $3000 fee paid to Allen. The exhibit also shows a payment of $5000 to Allen with no explanation as to what this amount covered. Allen withdrew both amounts without prior court approval. Louise signed a waiver of notice of hearing in which she acknowledged receipt of the report, waived accounting, and consented to the court entering an order approving the report. On September 18, the district court approved the report and again continued the guardianship and the conservatorship

Several months after the court approved the second annual report, Louise had a stroke and from that point on she was somewhat confused. A month after Louise suffered the stroke, Allen wrote to Louise's bank directing it to discontinue sending her duplicate statements of the guardianship and the conservatorship checking account. In the letter, Allen informed the bank that Louise "is no longer able to read or understand them. She is nearly ninety years old and is in the Health Care Center at Northcrest." Allen also directed the bank to send all statements and correspondence to him as her court-appointed guardian and conservator.

Louise died on September 28, 1996. In October, Allen prepared a final report of the conservatorship and the guardianship. The report showed that Allen paid himself $46,359. He described some of the disbursements in the report variously as "fees," "advance fees," and "gifts." The bulk of these expenditures—$32,800—had no designation at all. All of the expenditures were without prior court approval.

When Allen presented the report to the district court, the court noted these expenditures and the lack of authority for withdrawing them. This prompted the court to set the matter for hearing. The court ordered Allen to appear and explain the basis for the expenditures.

Allen, his sister and her husband, and the guardian ad litem appeared at the hearing on the final report. Allen admitted making the questioned expenditures without prior court approval. He explained the close relationship between Louise and him, and that except for some specific bequests, she had left the bulk of her estate to his sister and him. Allen contended that he had discussed the questioned expenditures with Louise. He described Louise as "mentally alert up until the day of her death." According to Allen, Louise's comment was "do whatever you need to do for yourself as long as I have enough to live on." Allen further explained: "We were doing this not only for my bene-

fit—and I will admit I needed the money at various times—but also for the estate's benefit to keep the estate under $600,000 and to minimize estate and inheritance taxes and income taxes, and mainly for the—just follow her wishes in her will and during her lifetime."

The guardian ad litem explained it was his "conclusion that the distributions were not in any way affecting [Louise's] health or well-being or her care and, in fact, were basically in order or were following her wishes expressed by her will and codicil; so on that ground alone, I have no objection to what has been done."

Allen's sister told the court that she and Allen had "discussed everything thoroughly. I have no objection to anything that he's done." Allen acknowledged he had received no advance authorization for the fees itemized in the report, but he claimed the fees should have been considered as gifts.

Following this hearing, the court entered an order in which it found that Allen had disregarded Iowa Code section 633.197 (1995) and Rule 2 of the Iowa Rules of Probate Procedure by paying himself fees without prior court approval. The court also found that Allen had ignored Iowa Code section 633.668 by making gifts to himself and others without prior court approval. The court ordered Allen to repay the $46,359 of unauthorized expenditures into the conservatorship. In addition, the court directed that a copy of the order and the conservators final report be sent to the board to be treated as a complaint. The court set a show-cause hearing on why Allen should not be removed as conservator in this matter and as executor in Louise's estate. (Allen had earlier opened Louise's estate and had been appointed executor.)

Eventually, Allen repaid the conservatorship the $46,359. Another attorney was able to close the conservatorship, and Allen's sister replaced Allen as executor in Louise's estate.

## II. Proceedings.

**A. The complaint.** The district court forwarded to the board copies of the final

report together with two court orders regarding the report. In its forwarding letter, the court briefly described the unauthorized expenditures. The court's action prompted the board to file the present complaint against Allen.

In connection with the unauthorized expenditures, the board charged Allen with violating Iowa Code sections 633.668 and 633.200 in addition to Iowa Rule of Probate Procedure 2. The board also charged Allen with violating Iowa Code of Professional Responsibility DR 1–102(A), DR 2–106(A), and DR 7–102(A)(8).

Section 633.668 pertinently provides that

[f]or good cause shown and *under order of court,* a conservator may make gifts on behalf of the ward out of the assets under a conservatorship to persons . . . to whom . . . such gifts were regularly made prior to the commencement of the conservatorship, or on a showing to the court that such gifts would benefit the ward or the ward's estate from the standpoint of income, gift, estate or inheritance taxes. The making of gifts out of the assets must not foreseeably impair the ability to provide adequately for the best interests of the ward.

*Id.* (emphasis added).

Section 633.200 authorizes the court to

allow and fix from time to time the compensation for fiduciaries, . . . and their attorneys for such services as they shall render as shown by an itemized claim or report made and filed setting forth what such services consist of during the period of time they continue to act in such capacities.

*Id.*

Iowa Rule of Probate Procedure 2(e) mandates that "[e]very report or application requesting compensation for other fiduciaries and their attorneys pursuant to Iowa Code section 633.200 shall be written and verified."

DR 1–102(A) in relevant part prohibits an attorney from violating a disciplinary rule, and from engaging in (1) illegal conduct involving moral turpitude, (2) conduct involving dishonesty, (3) conduct that is prejudicial to the administration of justice, and (4) conduct

that adversely reflects on the fitness to practice law. DR 2–106(A) prohibits a lawyer from "charg[ing] or collect[ing] an illegal or clearly excessive fee." DR 7–102(A)(8) provides that in representing a client a lawyer shall not "[k]nowingly engage in other illegal conduct or conduct contrary to a disciplinary rule."

**B. Prehearing matters.** Pursuant to Court Rule 118.6 and Iowa Rule of Civil Procedure 127, the board submitted twenty-two requests for admissions to which Allen did not respond. His failure to respond constituted an admission of all matters requested to be admitted. Iowa R. Civ. P. 127(b). All such matters were therefore conclusively established for purposes of the disciplinary hearing and the commission so found in its decision. *See* Iowa R. Civ. P. 127.

**C. The disciplinary hearing.** Pursuant to the admissions, the board conclusively established that Allen paid himself fees without prior court authorization and made all of the other unauthorized payments as we earlier described. In addition, pursuant to the admissions, the board conclusively established that Allen had violated the code provisions and disciplinary rules with which he was charged.

Besides the admissions, the board introduced, among other things, Louise's guardianship and conservatorship court file and a transcript of the hearing on the final report. In addition, the board introduced Allen's answers to the board's interrogatories. In those interrogatories, Allen stated he did not deny any of the requests for admissions and admitted he did not repay the $900 for travel time which the court had disallowed in the first order on fees.

Allen testified in his own behalf. Others testifying on his behalf included his sister, Ellyson, also known as Lisa; the broker who had handled Louise's investment accounts; numerous character witnesses (live and through written statements); and the attorney who had closed the conservatorship. In addition, Allen introduced Louise's will, correspondence between Louise and him, and a list of contacts between Louise and him from 1995 through 1996.

**1. The evidence.** We have carefully considered all of this testimony and all of the exhibits in an effort to understand how and why this deplorable situation evolved. We begin with Louise, a well-educated, well-traveled, energetic, and bright individual who loved those close to her. Three of the individuals closest to her were her younger sister and her sister's two children, Allen and Ellyson. Louise was especially close to Allen because she had helped raise him.

Louise had no children of her own, and she had always felt that Allen and Ellyson were the children she never had. She married late in life, and her husband died in 1969. Her husband had left her well-off financially. After her husband died, Louise looked to Allen to handle her business affairs.

Financially, Louise was very generous to Allen, Ellyson, and to their mother. Before the conservatorship, she loaned them money, forgave the loans, and made gifts.

Perhaps the best description of Louise and her relationship with Allen, his mother, and his sister came in a written statement from Allen's former wife, Joan Allen:

> Louise Gillespie was a fine woman with a firm sense of loyalty. Those of us privileged to know her well were privy to her plans to take care of her sister, Frances Whiting Allen and Fran's children, Stephen and Lisa. Louise let it be known that Fran would be her heir, always assuming that she would precede her in death. In the event of Fran's death, Stephen and Lisa were to be Louise's principal heirs because she felt that the other nieces and nephews would be amply taken care of by their parents who had money in their own right. This fact cannot be disputed. It was simply the truth of Louise's intentions.

Louise moved into a buy-in retirement home in 1976. She had her own apartment in independent living until 1992. In 1992 she moved into the health care center of the retirement facility where she had a room.

Allen's mother died in April 1993. Several months later, Allen opened the guardianship and the conservatorship for Louise with the understanding that Louise would still be able to have a checking account and pay some of

the local bills. Louise wanted Allen to serve as her guardian and conservator because he was the only one who knew all facets of her assets and investments and what bills needed to be paid.

Before Allen's mother died and before the conservatorship was opened, Louise executed a will in which she made specific bequests of $10,000 to nieces and nephews, including Allen and his sister, and to Louise's step-grandson. The bequests totaled $80,000. Louise left the remainder of her estate to Allen and his sister, with the understanding that they would take care of their mother from their share of the estate.

Later, after the conservatorship was opened, Louise canceled the specific bequests in a codicil to her will. She did so because the specific bequests had been satisfied—at her request—from a balloon payment of a farm contract that she owned. An explanation and accounting appears in the second annual report. The board made no challenge to these disbursements.

During his testimony before the commission, Allen was asked what role Louise had in authorizing or having a say about the payments that are at the heart of these proceedings. Allen responded as follows:

She didn't always know the specific amount that I was paying myself either as—she may have known as far as the fees and expenses but not the specific amount of loans. But I did visit with her usually, if possible, in person in her room in North-crest letting her know that either I had financial problems or my sons did or that for whatever reason I needed the money. And she would say on almost every occasion, "That's fine, you make sure that your family is taken care of as long as you have enough money to pay my bills and take care of me," and she'd kind of laugh. And that was the arrangement and that was repeated many times.

Low income from his practice, a divorce, his and his new wife's health problems, and expenditures for a son's wedding all led to a financial crisis for Allen. This, in turn, led him to take money from the conservatorship. He explained:

I was way overextended and really couldn't borrow money from the bank. I had borrowed money from three different banks for house, office and personal. I was pretty much maxed out as they say, on credit cards and I really didn't have any other place to turn. So that was the frame of mind and the situation that I was in at the time this happened.

When asked why he did not seek court approval in advance of the challenged disbursements, Allen's only excuse was that he did not have time to wait for approval and did not feel the court would approve the disbursements. As he put it, "I was in some cases almost desperate to make ends meet or my extended family may have been, my sons or in some cases my new family and so forth."

Allen met with Ellyson several days after Louise died. He had prepared a rough final report and disclosed the challenged disbursements to her. The two reached an understanding that Ellyson would get more distribution from Louise's estate than he to cover the money he had taken from the conservatorship. As it turned out, the court ordered Allen to reimburse the conservatorship in the amount of $46,369, which he borrowed from a bank, giving as collateral an assignment of his share of the estate.

Ellyson testified that she and Allen were very close. She related that Allen had on occasion discussed with her some of the "loans" he had made to himself from the conservatorship because he needed the money. She also confirmed that Allen went over all of the challenged disbursements with her shortly after Louise's death. In her words: "I was fine with what he was doing, and I knew that I would get my share."

Seven character witnesses testified on behalf of Allen. They included lawyers, business people, and his medical doctor. Written statements from three others, including his former wife, are also part of the record. All were of the opinion that Allen is honest, truthful, and trustworthy.

Before completing his testimony, Allen acknowledged his wrongdoing but insisted that he "did not do this with the intent to steal,

defraud, deceive or convert to my own use without payback." He claimed that had the conservatorship not been in existence, Louise would in some manner have made the money available to him. He asked the commission to "view this in the unique context that it's presented as far as the relationship, the close—very close family relationship that is involved."

**2. The commissions conclusions and recommendation.** In view of the fact that the board's request for admissions were deemed admitted, the commission had little trouble finding that the board had proven the violations charged. The commission gave these reasons for its recommended sanction of reprimand:

> The members of the ... commission are unanimous in their conviction that the situation which gave rise to this grievance would not have occurred under another set of circumstances and in particular that Mr. Allen would not have handled a conservatorship for a client other than his aunt in this manner. The [commission] also believes that Mr. Allen has never been subject to discipline before and does not believe that Mr. Allen is likely to engage in similar behavior in the future. The [commission] believes that Mr. Allen's actions are a one time mistake and an exercise of extremely poor judgment and in violation of the Iowa Probate Code as well as the Iowa Code of Professional Responsibility. Nevertheless, the [commission] believes that the dollar amounts involved and the number of times that Mr. Allen knowingly took financial advantage of the situation [in] which he found himself ... gives rise to serious concern and, therefore, the members of the [commission] recommend that Mr. Allen be publicly reprimanded.

**III. Appropriate Discipline.**

 Like the commission, we also find the board has established the violations it has alleged. The difficult question we face is the appropriate sanction.

With some exceptions, this court has consistently revoked a lawyer's license for converting client funds. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sylves-ter,* 548 N.W.2d 144, 147 (Iowa 1996) (revocation for converting on several occasions client and law firm funds totaling $6199); *Committee on Prof'l Ethics & Conduct v. Ottesen,* 525 N.W.2d 865, 865 (Iowa 1994) (revocation for converting client funds totaling $7334 in a three-month period); *Committee on Prof'l Ethics & Conduct v. Brodsky,* 487 N.W.2d 674, 674 (Iowa 1992) (revocation for converting $278,635.38 from trust); *Committee on Prof'l Ethics & Conduct v. Trujillo,* 479 N.W.2d 326, 326 (Iowa 1992) (revocation for embezzlement of client funds totaling $74,-867.12); *Committee on Prof'l Ethics & Conduct v. Tullar,* 466 N.W.2d 912, 914 (Iowa 1991) (revocation for converting on numerous occasions amounts totaling $18,458.05 of conservatorship funds); *Committee on Prof'l Ethics & Conduct v. Shepherd,* 431 N.W.2d 342, 344 (Iowa 1988) (revocation for commingling and converting client funds); *Committee on Prof'l Ethics & Conduct v. Piazza,* 405 N.W.2d 820, 823 (Iowa 1987) (revocation for converting partnership and client funds); *Committee on Prof'l Ethics & Conduct v. Silver,* 395 N.W.2d 877, 879 (Iowa 1986) (revocation for converting on single occasion $13,960.71 of client funds); *Committee on Prof'l Ethics & Conduct v. Fugate,* 394 N.W.2d 408, 410 (Iowa 1986) (revocation for converting client funds on numerous occasions); *Committee on Prof'l Ethics & Conduct v. Thomas,* 392 N.W.2d 150, 151 (Iowa 1986) (revocation for converting funds belonging to distributees of decedent's estate); *Committee on Prof'l Ethics & Conduct v. O'Connor,* 329 N.W.2d 1, 4 (Iowa 1983) (revocation for converting client funds); *Committee on Prof'l Ethics & Conduct v. Pappas,* 313 N.W.2d 532, 534 (Iowa 1981) (revocation for converting $24,000 of receivership funds and $6767 of conservatorship funds); *Committee on Prof'l Ethics & Conduct v. Shaffer,* 230 N.W.2d 1, 2 (Iowa 1975) (revocation for converting, on numerous occasions, client funds totaling $5000); *Committee on Prof'l Ethics & Conduct v. Rowe,* 225 N.W.2d 103, 104 (Iowa 1975) (revocation for converting $1500 of client funds); *Committee on Prof'l Ethics & Conduct v. Bronemann,* 210 N.W.2d 607, 608 (Iowa 1973) (revocation for converting funds coming into his hands as

attorney or fiduciary for other persons or clients).

On occasion, we have not imposed the ultimate sanction where the lawyer has converted client funds. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Gottschalk,* 553 N.W.2d 322, 325 (Iowa 1996) (one-year suspension for taking $1000 from trust account to pay office expenses; although attorney claimed there were probate fees in trust account totaling more than $1000 when he withdrew the funds, there were no court orders allowing the fees); *Committee on Prof'l Ethics & Conduct v. Harris,* 524 N.W.2d 179, 181 (Iowa 1994) (three-year suspension where one of the charges concerned the attorney's writing a client a check for $3000 from the lawyer's trust account at a time when the client only had $670 in the trust account, thus resulting in a conversion of $2330 of funds belonging to other clients); *Committee on Prof'l Ethics & Conduct v. Rauch,* 486 N.W.2d 39, 40 (Iowa 1992) (one-year suspension for several ethical violations including lawyer's conversion for his personal use $5000 intended as a gift in trust for his son; money was ultimately repaid).

■ As mentioned, Allen repaid the money he converted from the conservatorship. In several of the above cited cases, the disbarred lawyer likewise repaid the money taken. This, of course, provided no defense or mitigation to prevent revocation. *See, e.g., Ottesen,* 525 N.W.2d at 866; *Tullar,* 466 N.W.2d at 913; *Thomas,* 392 N.W.2d at 152.

■ In addition, Allen's sister and the guardian ad litem made no complaint about Allen's conversion of conservatorship funds. Their failure to complain, however, does not excuse Allen. *See Committee on Prof'l Ethics & Conduct v. Winkel,* 542 N.W.2d 252, 254 (Iowa 1996) (holding that failure of client to complain is not a mitigating factor). Moreover, the fact that Allen's actions may have injured no one does not excuse those actions. *See Committee on Prof'l Ethics & Conduct v. Clauss,* 445 N.W.2d 758, 760 (Iowa 1989).

Sanctions for taking fees without prior court approval have ranged from a reprimand to a two-year suspension. *See, e.g.*

*Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Smith,* 569 N.W.2d 499, 503 (Iowa 1997) (thirty-day suspension for taking premature payment of probate fees without court authorization and securing extraordinary fee for small estate that was not justified); *Committee on Prof'l Ethics & Conduct v. Jackson,* 492 N.W.2d 430, 435 (Iowa 1992) (reprimand for taking premature receipt of fees in probate); *Committee on Prof'l Ethics & Conduct v. Zimmerman,* 465 N.W.2d 288, 293 (Iowa 1991) (six-month suspension for taking excessive and duplicate fees in conservatorship); *Committee on Prof'l Ethics & Conduct v. Coddington,* 360 N.W.2d 823, 826 (Iowa 1985) (two-year suspension for taking fees in conservatorship and estate without prior court approval; aggravating circumstance included fact that lawyer withdrew $15,000 without court approval which lawyer claimed was mistakingly reported as "fees").

■ As to two of the unauthorized fees, Allen later secured court orders approving them. This later ratification did not, however, remove the impropriety of the earlier payments. *See Jackson,* 492 N.W.2d at 433.

■ We have mentioned the character testimony through witnesses and written statements. Although we consider this evidence when determining the appropriate sanction, the character testimony neither excuses nor reduces the seriousness of the unethical conduct. *See Committee on Prof'l Ethics & Conduct v. Cody,* 412 N.W.2d 637, 641 (Iowa 1987).

The facts here are unique. Unlike most cases involving conversion of funds, Allen made no attempt to cover up his actions. He accounted for all expenditures in the annual report and in the final report. Had Allen secured waivers of accounting from all the interested parties, this matter may never have seen the light of day. To his credit, Allen chose not to pursue this course of action. The irony in this case is that without the conservatorship, Louise might have bailed Allen out of his financial crisis.

■ Nevertheless, the fact remains that Allen took fees without court approval, made unauthorized gifts to himself, and on numerous occasions took substantial amounts of

money from the conservatorship for his own personal use. In short, he converted his client's funds and in doing so breached his position of trust. The high standards the law imposes on guardians and conservators do not diminish simply because of a close relationship between such fiduciaries and the ward.

What is most disturbing is that on fifteen different occasions after Louise had a stroke, Allen took substantial amounts of money. Allen admitted Louise was not aware of the specific amount of "loans" he made to himself from conservatorship funds.

We heard arguments on behalf of Allen that were similar to arguments made in *Ottesen*. What we said in response to those arguments in *Ottesen* has particular application here:

> The commission, while recognizing the seriousness of Ottesen's violations, was nevertheless moved to recommend only a three-year suspension. It was impressed by Ottesen's candor, contriteness, years of professional service, and the fact that no client ended up harmed because client funds were eventually restored. The commission was also moved by the obvious financial pressures on Ottesen at time. He had only recently begun his sole practice and three of his eight children were in college.
>
> These matters, though they add distress to what we see as our clear duty in fixing the sanction, do not control. They are outweighed by the stern demands of public interest. The public, as well as our profession in its service to it, needs to know that disbarment is almost certain to follow a lawyer's conversion of funds.

*Ottesen*, 525 N.W.2d at 866.

We think the same stern demands of public interest apply here. We must continually impress on the public, as well as lawyers, that severe disciplinary action will certainly follow a lawyer's conversion of client funds. Considering all of the facts here, we think a one-year suspension is appropriate. Significantly, the board in oral argument steered clear of a recommendation for revocation, being satisfied with a suspension.

We order that Stephen W. Allen's license to practice law in this state is suspended indefinitely with no possibility of reinstatement for one year from the date of this opinion. This suspension shall apply to all facets of the practice of law. *See* Iowa Sup. Ct. R. 118.12. In addition, Allen shall be prohibited from serving as a judicial magistrate during the period of this suspension. Costs are assessed to Allen under Iowa Supreme Court Rule 118.22.

**LICENSE SUSPENDED.**