**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

v.

**Curtis A. BELL, Respondent.**

No. 02–0651.

Supreme Court of Iowa.

Sept. 5, 2002.

Rehearing Denied Sept. 26, 2002.

Norman Bastemeyer and Charles Harrington, Des Moines, for complainant.

Jane Rosien, Winterset, for respondent.

TERNUS, Justice.

This attorney disciplinary proceeding involves the conduct of attorney Curtis A. Bell in his role as treasurer of the Iowa Intellectual Property Law Association. The Iowa Supreme Court Grievance Commission found that Bell had made two withdrawals from the Association's account, totaling $11,000.00, and had placed

these funds in his personal account for his individual use. Finding these actions violated Bell's ethical obligations, the Commission recommends Bell's license to practice law be suspended for five years.

■ We review de novo the record made before the Commission and decide the matter, taking into consideration the factual findings and disciplinary recommendation made by the Commission. *Comm. on Prof'l Ethics & Conduct v. Shepler*, 519 N.W.2d 92, 93 (Iowa 1994). While we agree with the factual findings made by the Commission in this case, as well as its conclusion that Bell's conduct violated our disciplinary rules, we respectfully differ in our assessment of the appropriate sanction. We conclude Bell's misconduct demonstrates his unfitness to continue in this profession and, accordingly, we revoke his license to practice law in this state.

### I. *Factual Findings.*

We find the following facts. Bell was admitted to the Iowa bar in 1992. Since then, he has engaged in the private practice of law, primarily in the field of patent law.

In 1995, Bell became the treasurer of the Iowa Intellectual Property Law Association, a not-for-profit organization formed to promote intellectual property in Iowa. The Association holds an annual fall seminar, which is the primary source of income for the organization. Bell, as treasurer, was responsible for maintaining the Association's funds.

Sometime in the latter part of 1998, Bell wrote a $2000 check on the Association's account made payable to himself. In January 1999 he deposited this check in his personal bank account. In April 1999 Bell issued a second check to himself on the Association's account, this time in the amount of $9000. This check was also deposited in Bell's personal checking account and was used to pay Bell's 1998 income taxes. Both withdrawals from the Association's account were made without the knowledge or consent of the Association's officers or members. In addition, Bell's written and oral reports to the organization in his capacity as treasurer did not disclose these transactions.

Prior to the fall 2000 seminar, Bell's secretary informed the Association of his April 1999 withdrawal of Association funds and his deposit of those moneys into his personal account. The Association president, Herbert Jervis, and a board member then met with Bell. When confronted with a copy of the $9000 check, Bell admitted that these funds were not in an Association account. Bell did not, however, reveal his initial $2000 withdrawal.

After this meeting, on October 4, 2000, Bell opened a savings account in the Association's name and deposited $11,310.69 into the account. He testified this sum represented the $11,000 he had taken from the Association's checking account with interest. Bell subsequently wrote to Jervis, informing Jervis that the missing funds had been returned to the Association. Bell then resigned from his position as treasurer.

Later, the Association's new president, Jeffrey Harty, met with Bell. Bell was candid at this meeting about what had happened and admitted he made a mistake by taking an "inappropriate loan" from the Association. Bell told Harty he had always intended to put the funds in an interest-bearing account in the name of the Association, but through procrastination had never accomplished that objective.

Bell subsequently spoke with Harty by phone and told Harty that he—Bell—had consulted an attorney as to whether or not his conduct should be reported as an ethi-

cal violation. Bell informed Harty that because he had no intent to deprive the Association of its funds, it was not necessary to report the matter to the Iowa Supreme Court Board of Professional Ethics and Conduct. When the Association board learned that Bell did not intend to inform the Ethics Board of his actions, Harty, on behalf of the Association, contacted the disciplinary authorities.

## II. *Disciplinary Proceedings.*

The Ethics Board filed a complaint with the Grievance Commission alleging that Bell had misappropriated and converted funds belonging to the Association. The Board asserted this conduct violated the Iowa Code of Professional Responsibility for Lawyers DR 1–102(A)(1), (3), (4), and (6), which provides:

(A) A lawyer shall not:

(1) Violate a disciplinary rule.

. . . .

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

. . . .

(6) Engage in any other conduct that adversely reflects on the fitness to practice law.

After a hearing at which Bell, Harty, and others testified, the Commission concluded Bell had committed theft by misappropriation as defined in Iowa Code section 714.1(2) (2001), which states:

A person commits theft when the person does any of the following:

. . . .

2. Misappropriates property which the person has in trust, or property of another which the person has in the person's possession or control, whether such possession or control is lawful or unlawful, by using or disposing of it in a manner which is inconsistent with or a denial of the trust or of the owner's rights in such property. . . .

The Commission concluded that Bell's misappropriation of Association funds violated DR 1–102(A)(3) (illegal conduct involving moral turpitude) and (4) (conduct involving dishonesty, fraud, deceit, or misrepresentation) and reflected adversely on his fitness to practice law in violation of DR 1–102(A)(6). The Commission also noted that Bell's conduct was prejudicial to the administration of justice, a violation of DR 1–102(A)(5).

## III. *Ethical Violations.*

■ The Ethics Board must establish the respondent's violations of the code of professional responsibility by a convincing preponderance of the evidence. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Adams,* 623 N.W.2d 815, 818 (Iowa 2001). We conclude the Board has satisfied this burden.

■ Having reviewed the record in this case, we concur in the Grievance Commission's finding that Bell misappropriated Association funds. Bell took money of another under his control and used it in a manner inconsistent with the owner's rights. Although Bell argues he always intended to place the money he took in an interest-bearing account in the Association's name, his professed lack of intent to deprive the Association of its moneys is no defense to the crime of misappropriation. *See State v. Ludvigson,* 482 N.W.2d 419, 423 (Iowa 1992).

We agree with the Commission that Bell's conversion of the Association's funds to his personal benefit violates DR 1–102(A)(3) because he engaged in "illegal conduct involving moral turpitude." *See Iowa Supreme Ct. Bd. of Prof'l Ethics &*

*Conduct v. Schatz,* 595 N.W.2d 794, 795–96 (Iowa 1999) (holding attorney's violation of Iowa Code section 714.1(2) (1997) established a violation of DR 1–102(A)(3)); *see also Comm. on Prof'l Ethics & Conduct v. Hall,* 463 N.W.2d 30, 33, 35 (Iowa 1990) (holding respondent's violation of Iowa Code section 714.1(3) (1989) constituted a violation of DR 1–102(A)(3) even though "respondent was not charged or convicted of a crime"); *Comm. on Prof'l Ethics & Conduct v. Pappas,* 313 N.W.2d 532, 534 (Iowa 1981) (holding conversion of funds held as a fiduciary in violation of Iowa Code section 714.1 was a violation of DR 1–102(A)(3)). Bell's actions also violated DR 1–102(A)(4), which prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation." *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Leon,* 602 N.W.2d 336, 338 (Iowa 1999) (misappropriation of client trust funds); *Hall,* 463 N.W.2d at 33 (theft by deception). Finally, we agree with the Commission's conclusion that Bell violated DR 1–102(A)(6) since his misappropriation clearly reflects adversely on his character and, hence, his fitness to practice law. *See Schatz,* 595 N.W.2d at 796 (embezzlement of law firm funds); *Pappas,* 313 N.W.2d at 534 (conversion of client and fiduciary funds). We now consider the appropriate discipline.

### IV. *Discipline.*

 The appropriate sanction in a particular case depends upon several factors that reflect the broad purpose of our disciplinary system. The disciplinary process is intended to protect not only the public, but also our system of justice. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mulford,* 625 N.W.2d 672, 684 (Iowa 2001). Therefore, we consider the nature and extent of the respondent's ethical violations not only to determine the respondent's fitness to practice law, but

also to assess the need to deter other lawyers from similar misconduct. *Id.; Adams,* 623 N.W.2d at 818. Only by ensuring that such conduct does not become commonplace or acceptable can we maintain the reputation of the bar and safeguard the integrity of our system of justice and the public's confidence in it. *See Mulford,* 625 N.W.2d at 684. Because "[s]anctions must be tailored to the facts of each case," we also consider any mitigating and aggravating circumstances. *Id.*

The nature of Bell's ethical violations is very serious indeed. In fact, we have stated, "There is no place in our profession for lawyers who convert funds entrusted to them. It is almost axiomatic that we revoke licenses of lawyers who do so." *Comm. on Prof'l Ethics & Conduct v. Ottesen,* 525 N.W.2d 865, 866 (Iowa 1994); *accord Leon,* 602 N.W.2d at 338 (noting that "misappropriation of client funds routinely demands revocation"). The fact that the misappropriation here did not involve client funds does not diminish the seriousness of the violation. As this court said in *Schatz,* our obligation to protect the public from theft and deceit "is no less important when the theft and deceit [do] not directly involve client funds." 595 N.W.2d at 796. Nor is the transgression any less grave because Bell was not acting in his capacity as a lawyer. *See Comm. on Prof'l Ethics & Conduct v. Connolly,* 476 N.W.2d 41, 42 (Iowa 1991) ("The committee was not required to prove Connolly was acting as a lawyer at the time of his misconduct; lawyers may be in violation of their professional responsibilities when conducting other business transactions or ventures."); *Hall,* 463 N.W.2d at 35 (stating "the committee need not prove respondent was acting as a lawyer at the time of the alleged misconduct"). Clearly, in the absence of mitigating factors, revocation can be the

anticipated discipline for lawyers who convert monies entrusted to them.

■ Bell argues there are mitigating circumstances present here that warrant a relaxation of the typical discipline. He asserts his alleged plan to replace the funds he took from the Association's checking account is a mitigating factor, but we disagree.[1] Bell's intent in this regard was no more than a vague and abstract thought that at some point in the future he would replace the funds he had converted. The conventional wisdom, "actions speak louder than words," is appropriate. Bell did not repay one dollar of his unauthorized "loans" until he was caught, despite the fact he had more than a year to do so. Bell does not claim he lacked the financial means to make repayment; in fact, upon the Association's discovery of Bell's theft, he quickly returned the amounts he had taken. Bell's excuse for his tardy restitution was that the press of other matters took priority. We think if Bell had truly understood the gravity of his actions and had genuinely intended to replace the Association's funds, he would have done so long before the discovery of his confiscation. Consequently, we give no weight to Bell's belated assertion that he always intended to make repayment.

■ The other circumstance upon which Bell relies to mitigate the sanction in this case is his cooperation with the investigation conducted by the Association and, later, by the Ethics Board. An attorney's cooperation with an ethics investigation is expected and required. A failure to cooperate is in itself an ethical violation. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Naylor,* 623 N.W.2d 814, 815 (Iowa 2001); *Connolly,* 476 N.W.2d at 42. Thus, while Bell's performance of his ethical obligation in this regard is good, it is not sufficient to avoid revocation if such discipline is otherwise warranted.

Despite the absence of significant mitigating circumstances, we have carefully considered the Commission's recommendation of suspension. Such an outcome is not without precedent, as on rare occasions in the past, we have spared an attorney the ultimate sanction of revocation even though the lawyer has misappropriated funds. *E.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Allen,* 586 N.W.2d 383, 391 (Iowa 1998) (one-year suspension); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hansel,* 558 N.W.2d 186, 192 (Iowa 1997) (three-year suspension); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Gottschalk,* 553 N.W.2d 322, 325 (Iowa 1996) (one-year suspension); *Comm. on Prof'l Ethics & Conduct v. Harris,* 524 N.W.2d 179, 180 (Iowa 1994) (three-year suspension); *Comm. on Prof'l Ethics & Conduct v. Rauch,* 486 N.W.2d 39, 40 (Iowa 1992) (one-year suspension).[2]

1. Bell does not claim that his actual repayment of the Association's funds after his theft was discovered is in any way a mitigating factor and, indeed, it is not. We have consistently held that repayment of misappropriated funds provides "no defense or mitigation to prevent revocation." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Allen,* 586 N.W.2d 383, 390 (Iowa 1998); *accord Comm. on Prof'l Ethics & Conduct v. Tullar,* 466 N.W.2d 912, 913 (Iowa 1991) (revoking respondent's license despite his reimbursement of stolen funds); *Comm. on Prof'l Ethics & Conduct v. Silver,* 395 N.W.2d 877, 878–79 (Iowa 1986) (revoking attorney's license even though he had replaced stolen funds with interest); *Pappas,* 313 N.W.2d at 533–34 (revoking respondent's license even though he had made restitution).

2. We have also shown leniency when the theft is accomplished through writing insufficient funds checks, at least when the theft is a misdemeanor. *E.g., Comm. on Prof'l Ethics & Conduct v. Cody,* 412 N.W.2d 637, 639, 641 (Iowa 1987) (imposing two-and-one-half-year suspension on attorney convicted of two counts of third-degree theft, aggravated mis-

We find these cases distinguishable from the present matter.

In *Allen,* the respondent lawyer served as the conservator for his Aunt Louise, who was nearly ninety years old. 586 N.W.2d at 384. With the exception of some specific bequests, Allen and his sister were the sole beneficiaries under Louise's will. *Id.* at 385. After Louise passed away, Allen filed a final report in the conservatorship showing he had made several disbursements, including fee payments, from the conservatorship to himself without prior court approval. *Id.* Although Allen lacked court approval, Allen's sister was aware of these payments and had no objection to them. *Id.* at 386. In addition, Louise's guardian ad litem had no objection to the disbursements, concluding they did not affect Louise's care or well-being and were consistent with her wishes as expressed in her will. *Id.* In choosing to suspend Allen's license, we made the following observations:

> The facts here are unique. Unlike most cases involving conversion of funds, Allen made no attempt to cover up his actions. He accounted for all expenditures in the annual report and in the final report. Had Allen secured waivers of accounting from all the interested parties, this matter may never have seen the light of day. To his credit, Allen chose not to pursue this course of action. The irony in this case is that without the conservatorship, Louise might have bailed Allen out of his financial crisis.

*Id.* at 390.

A somewhat similar situation existed in *Rauch,* where the respondent served as the executor for his uncle's estate and was the residuary beneficiary as well. 486 N.W.2d at 39. In that case, the respon-

demeanors, based on writing bad checks to pay for supplies in business venture). Obvi-

dent delayed funding a testamentary trust for his son that was established in his uncle's will. *Id.* Instead, he used the $5000 gift for his personal needs. *Id.* Prior to using the funds, respondent had obtained the consent of the child's mother, his former wife, and he ultimately repaid the money and funded the trust. *Id.* We agreed with the Commission that "because respondent was himself the residuary beneficiary of the estate and [had] secured permission of the child's guardian to delay funding the trust, the violation did not warrant the extreme sanction of disbarment." *Id.* at 40.

In two cases in which we opted for suspension rather then revocation, the attorney had not taken the misappropriated funds for his own use. In *Harris,* the attorney wrote a check on his trust account to a client who did not have enough funds in the trust account to cover the check. 524 N.W.2d at 180. This deficiency resulted in a conversion of funds— $2330—belonging to other clients. *Id.* We concluded the fact respondent was "not charged with obtaining funds for himself ... militate[d] in favor of a lighter sanction" than disbarment. *Id.* at 181.

Similarly, in *Hansel,* the evidence fell short "of establishing that [respondent] took client money for his own use." 558 N.W.2d at 192. Although the court also found the respondent had used proceeds from the sale of collateral to pay farm expenses and debt rather than applying the proceeds to his secured operating loan, the court disagreed as to whether this conduct violated DR 1–102(A)(3). *Id.* at 192–93 (Neuman, J., concurring in part and dissenting in part). The court rejected the Commission's recommendation for a three-month suspension, and instead imposed a three-year suspension. *Id.* at 192.

ously, that fact pattern is not present here.

Finally, in *Gottschalk,* we chose to suspend an attorney's license rather than disbar him for converting $1000 in client trust funds. 553 N.W.2d at 325. In that case, the respondent took $1000 from his trust account to pay staff wages and office expenses. *Id.* at 323. Although he maintained there was more than $1000 in earned probate fees in the trust account at the time of his withdrawal, he had no court order authorizing the payment of these fees. *Id.* at 324. Slightly more than four months after making the inappropriate withdrawal and before anyone had discovered his misconduct, the respondent repaid the $1000 he had taken. *Id.* Under these circumstances, we followed the Commission's recommendation of leniency. *Id.* at 325.

As noted above, we think these cases are distinguishable from the situation before us. Here, Bell had absolutely no claim of entitlement to or expectation of receiving any of the funds held in the Association's checking account. Nor did he have the consent of anyone in a position of authority with the Association to make his withdrawals. Plain and simple, he stole someone else's money, not once, but twice, and then concealed what he had done. *See Leon,* 602 N.W.2d at 339 (finding *Harris* (three-year suspension) distinguishable and imposing revocation, in part because attorney misappropriated funds on more than one occasion and in part because "he lied to further the cover-up"); *cf. Comm. on Prof'l Ethics & Conduct v. Silver,* 395 N.W.2d 877, 879 (1986) (revoking respondent's license for single incident of conversion).

In addition, Bell's subsequent conduct indicates he felt no urgency to rectify his mistake, a revealing reflection of his lack of sensitivity to his ethical duty. Although he claims he was busy with other matters, the pressures of a law practice do not excuse Bell's conduct. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mears,* 569 N.W.2d 132, 134 (Iowa 1997). The fact that other matters took precedence over his ethical obligation shows a troubling lack of judgment on Bell's part in setting priorities.

Bell's inadequate understanding of the nature and extent of his ethical responsibilities is further highlighted by his continued failure to appreciate the gravity of his actions even after they were discovered. Despite time to reflect on what had happened, he persisted in believing he had committed no reportable ethical infraction. Although Bell later testified before the Commission that what he did was "inappropriate," "very wrong," and reflected adversely on his fitness to practice law, he continued to minimize the wrongfulness of his actions, taking the position in the disciplinary proceedings that his conduct did not violate DR 1–102(A)(3) ("illegal conduct involving moral turpitude") or DR 1–102(A)(4) ("conduct involving dishonesty, fraud, deceit, or misrepresentation"). We find Bell's failure to appreciate the wrongfulness of his actions to be an aggravating circumstance. *See Hall,* 463 N.W.2d at 36 (holding that attorney's belief "that he really did nothing wrong" to be an aggravating factor supporting revocation).

In summary, we conclude revocation is appropriate. We are fully aware this proceeding involves Bell's first ethical violation. Nevertheless, in view of Bell's willful and knowing misappropriation of funds to his personal use and the aggravating circumstances previously noted, disbarment is warranted. The license of Curtis A. Bell to practice law in this state is revoked. Costs are taxed to Bell. *See* Iowa Ct. R. 35.25(1).

**LICENSE REVOKED.**